# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| THOMAS SEBASTIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 05 C 2077 |
| | ) | |
| CITY OF CHICAGO, DAN ALLEN, | ) | Judge Virginia M. Kendall |
| CHRIS KOZICKI, and STAN-LEE | ) | |
| KADERBEK, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Thomas Sebastian ("Sebastian" or "Plaintiff") filed suit against Defendants City of Chicago (the "City"), Dan Allen ("Allen"), Chris Kozicki ("Kozicki"), and Stan-Lee Kaderbek ("Kaderbek") (collectively "Defendants") under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1983 ("§ 1983"), and 745 ILCS 10/9-102. Sebastian alleges that: (1) the City discriminated against him on the basis of his national origin and race in violation of Title VII; (2) the City retaliated against him in violation of Title VII; and (3) Defendants failed to promote him in violation of the First Amendment and § 1983. Sebastian seeks indemnification from the City on the § 1983 claim pursuant to 745 ILCS 10/9-102. All Defendants moved for summary judgment on all claims. For the reasons set forth below, Defendant Allen's Motion For Summary Judgment is granted with respect to Counts I and II and denied with respect to Count III. The City Defendants' Motion For Summary Judgment is granted with respect to Counts II and III and denied with respect to Counts I and IV. Finally, Sebastian's Motion to Strike portions of Defendants' reply pleadings is granted in part and denied in part consistent with this Opinion.

## STATEMENT OF UNDISPUTED FACTS

Sebastian is an electrical sign inspector for the City's Electrical Bureau (the "EB

Department") of the Department of Buildings (the "Department"), where he has worked since 1987.[1]

 (Pl. Resp. 56.1 ¶ 5.)  Sebastian claims that he was qualified to be promoted to the position of a supervising electrical inspector and that he was passed over by other politically connected candidates due to his race, national origin, and because he was not politically active.  Sebastian earned a Supervising Electrician's license in 1985, is a member of the International Brotherhood of Electrical Workers ("IBEW"), Local 134, and has over thirty years of experience in the electrical

---

[1]   Citations to "Plaintiff's Response to Defendant's Local Rule 56.1(a)(3) Statement" have been abbreviated to "Pl. 56.1 Resp."  Citations to the exhibits supporting "Plaintiff's Sur-response in Opposition to Defendants' Motions For Summary Judgment" have been abbreviated to "Pl. Sur-response, Ex."  Citations to "Defendant Allen's Objections and Responses to Plaintiff's 56.1(b)(3)(B) Statement of Facts" have been abbreviated to "Allen 56.1 Resp."  Finally, citations to "City Defendants' Objections and Responses to Plaintiff's 56.1(b)(3)(B) Statement of Facts" have been abbreviated to "City Defs. 56.1 Resp."

The Court notes with considerable displeasure that the parties have failed to comply with L.R. 56.1.  That rule allows a party opposing summary judgment to file a statement of undisputed material facts consisting of "short numbered paragraphs."  Ignoring that obligation, Sebastian has filed a statement of undisputed material facts that contains numerous lengthy paragraphs that one cannot characterize as "short."  To be sure, over one-third of the 91 numbered paragraphs contained in Sebastian's Local Rule 56.1(b)(3)(B) statement violate the "short numbered paragraphs" limitation.  Making matters worse, several statements within the paragraphs misrepresent the facts and either contain no citation to the record or an incorrect citation to the record.  Sebastian's submission violates not only the letter, but also the spirit of Local Rule 56.1.  While not as egregious, Defendants have also failed to comply with L.R. 56.1.  For instance, both Allen and the City Defendants include several numbered paragraphs that exceed the "short paragraph" restriction.  In addition,  Allen and City Defendants have admitted and/or denied certain statements, but then improperly included additional facts and arguments in their response paragraphs.  The City Defendants (and Allen at times) have also included a general authenticity objection in response to several of Sebastian's citations to the record without properly explaining or supporting the objections.

The Court granted several requests for extensions to discovery and briefing schedules.  Nevertheless, the parties failed to use this additional time to sort through non-issues and present only material facts to the Court, or properly draft and format their filings.  Instead, the parties abused the Court's generosity by forcing the Court to wade through convoluted, noncompliant Local Rule 56.1 submissions on the eve of trial.

Nonconformity with the Local Rules and the standing orders of the Court is not without consequence.  *Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, at *8 (N.D. Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1). The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1."  *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)).  "A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed."  *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005).  Accordingly, this Court will not consider portions of the parties' submissions that do not contain proper support from the parties' citations to the record.  In addition, the Court denies Defendants' general authenticity objections to the extent that they failed to properly develop such arguments.  Finally, the Court strikes any additional facts or arguments improperly included in their response paragraphs or summary judgment memoranda.  Consistent with this conclusion, the Court will not consider any arguments that rely upon the excluded evidence.

industry.   (Allen Resp. 56.1 ¶¶ 1-2; City Defs. Resp. 56.1 ¶¶ 1-2; Pl. Resp. 56.1 ¶ 5.)

During his tenure with the EB Department, Sebastian held responsibility in several EB functions: field wiring inspections, electrical plan examination, court case team inspections, and electrical sign inspections.  (Allen Resp. 56.1 ¶ 3; City Defs. Resp. 56.1 ¶ 3.)  One of his previous supervisors, Rochester Bailey ("Bailey"), described Sebastian as: (1) an excellent inspector; (2) a specialist of the EB Department's switchboards and switchgears work; (3) excellent with the task of load calculations; (4) very knowledgeable with regard to the Electrical Code (the "Code"); and (5) one who was prompt, stayed late to finish jobs, and never refused assignments.[2]  (Allen Resp. 56.1 ¶ 4; City Defs. Resp. 56.1 ¶ 4; Pl. 56.1 Resp., Ex. 4, Bailey Dep. 41-42, 69-70, 76-78, 130, 163.)   In 1991 and 2004, Chief Electrical Inspector Timothy Cullerton ("Cullerton") and Deputy Commissioner Milt Patterson ("Patterson"), respectively, commended Sebastian for "consistently excellent" performance and a "high degree of professionalism."  (Allen Resp. 56.1 ¶ 3; City Defs. Resp. 56.1 ¶ 3; Pl. 56.1 Resp. Ex. 1, Bid Application.)   In 1994, Sebastian received a Commissioner's Special Service Award.  (Allen Resp. 56.1 ¶ 3; City Defs. Resp. 56.1 ¶ 3.)

<u>Stan-Lee Kaderbek</u>

Kaderbek is a civil engineer who served as the Deputy Commissioner/Chief Engineer of the City's Department of Transportation Bureau of Bridges and Transit from 1993 through 2003.  (Pl. Resp. 56.1 ¶ 70.)  In August 2003, Kaderbek joined the City's Department of Transportation as the

---

[2]   Throughout Sebastian's 56.1(b)(3)(B) Statement of Facts and his Response to Defendant's Local Rule 56.1(a)(3) Statement, Sebastian cites to the testimony of individuals without laying the proper foundation to establish that the individuals had the requisite personal or firsthand knowledge.  *See* Fed. R. Evid. 602.  To the extent that Sebastian has failed to comply with Local Rule 56(e) and Fed. R. Evid. 602, such statements will not be considered by the Court.  Additionally, the Court notes that Sebastian also attempts to support his statements of facts and/or denials with several conclusory assertions made by himself and others, without supporting the assertions with specific facts.  Such conclusory opinions are also insufficient to create a genuine issue of material fact and, therefore, will also be disregarded by the Court. *See Burks v. Wisconsin Dept. of Trans.*, 464 F.3d 744, 752 (7th Cir. 2006).

First Deputy Commissioner.  In June 2004, he became the Commissioner of the Department of Buildings, where he was charged with the enforcement of the City's Building Code.  (*Id.*)  Kaderbek resigned as Commissioner in 2005.  (Allen Resp. 56.1 ¶ 9; City Defs. Resp. 56.1 ¶ 9.)  In 1996, Kaderbek volunteered to do political work. (Allen Resp. 56.1 ¶ 10; City Defs. Resp. 56.1 ¶ 10.) Kaderbek explained that he was interested in volunteering because,  in predisciplinary hearings, employees would use the their political work as an excuse for inadequate performance.  (Allen Resp. 56.1 ¶ 10; City Defs. Resp. 56.1 ¶ 10; Pl. 56.1 Resp., Ex. 20, 103-04.)  Kaderbek thought it would help him to respond to employees because he could "look them straight in the face and say, you know what, I do it too and I still do my job." (Pl. 56.1 Resp., Ex. 20, 103-04.)

### Chris Kozicki

Kozicki began his career as an assistant to family friend, 11th Ward Alderman Patrick Huels ("Huels").  (Allen Resp. 56.1 ¶ 8; City Defs. Resp. 56.1 ¶ 8; Pl. 56.1 Resp. Ex. 15, 20-22.)  Kozicki worked as a volunteer for the 11th Ward Democratic organization and ultimately became a political coordinator for the 11th Ward where he organized and directed political volunteers.  (Allen Resp. 56.1 ¶ 8; City Defs. Resp. 56.1 ¶ 8.)  In 1993, Kozicki was appointed to work for Mayor Daley's brother, John Daley, who then recommended him to Mayor Daley's Chief of Staff for a position as assistant commissioner/project manager for the Department. (Allen Resp. 56.1 ¶ 8; City Defs. Resp. 56.1 ¶ 8.)  Kozicki was appointed to an Assistant Commissioner position with the Department in 1995, appointed to a Deputy Commissioner position in the Department in 1997, and appointed to a Managing Deputy Commissioner in the Department of Buildings in 2003.  (Pl. Resp. 56.1 ¶ 71; Allen Resp. 56.1 ¶ 8; City Defs. Resp. 56.1 ¶ 8.)  As a Managing Deputy Commissioner under Kaderbek, Kozicki had the daily responsibility of ensuring the performance of inspections.  (Pl.

Resp. 56.1 ¶ 71.)  In 2006, Kozicki became a Deputy Commissioner in the City's Department of Planning and Development.  (*Id.*)

Dan Allen

Allen is the Chief Electrical Inspector of the EB Department and began working in the EB Department in 1980.[3]  (Pl. Resp. 56.1 ¶ 4.)  Prior to joining the EB Department, he had never been employed as a paid mechanic electrician.  (Allen Resp. 56.1 ¶ 5; City Defs. Resp. 56.1 ¶ 5; Pl. 56.1 Resp., Ex. 8, Allen Dep. 21-26.)  Allen subsequently applied for and was promoted to supervising electrical inspector in 2000 and to his current position in October 2003.  (Pl. Resp. 56.1 ¶ 4.)

Allen is the brother of 38th Ward Alderman Thomas Allen ("Alderman Allen").  (Allen Resp. 56.1 ¶ 5; City Defs. Resp. 56.1 ¶ 5; Pl. 56.1 Resp. 7; Pl. 56.1 Resp. Ex. 10, Allen Dep. 60.)  From 1994 to the present, Sebastian and his wife have received mailings at their home from "Citizens for Tom Allen," an organization that raises money for Alderman Allen's political campaigns.  (Pl. Resp. 56.1 ¶¶ 6-7; Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 24-38, 44-47, 221-23.)  From 1994 through 2002, Sebastian donated to "Citizens for Tom Allen."  (Pl. Resp. 56.1 ¶ 7; Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7.)  When Sebastian first donated in 1994, he and Dan Allen were electrical inspectors in the EB Department.  (Pl. Resp. 56.1 ¶ 7.)

Sebastian stated that Allen first asked him to provide political contributions to Alderman Allen's political campaigns in 1994 and that Sebastian continued to do so until 2003.[4]  (Allen Resp.

---

[3] At the time of Allen's hiring, his brother-in-law, Cullerton, held the Chief Electrical Inspector position.  (Allen Resp. 56.1 ¶ 5; City Defs. Resp. 56.1 ¶ 5; Pl. 56.1 Resp. Ex. 10, Allen Dep. 60.)

[4] Allen and the City Defendants argue that Sebastian's testimony regarding Allen's alleged political solicitations and statements directly contradicts his prior statements and, therefore, should be disregarded or stricken. Having considered the cited testimony in the context of Sebastian's prior statements, the Court concludes that Sebastian's

5

56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 24.) Sebastian further testified that, in 2001, one year after Allen became a supervising electrical inspector, Allen told him that his 2001 contribution to Alderman Allen's campaign was insufficient. (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 37-38.) As a result, Sebastian made a second contribution. (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 37-38.) In 2002, Sebastian donated to Alderman Allen's campaign and told Allen that he did not want to make any more political contributions to the campaign. (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 43-45.) According to Sebastian only, Allen then told Sebastian he was a "cheap Indian." (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 43-45.) Allen denies the conversation and maintains that he never solicited political contributions from Sebastian or any other City employee. (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; City Defs. 56.1 Resp., Allen Aff. ¶ 4.)

### 2004 Supervising Electrical Inspector Promotion

According to Kozicki, the Department used the following procedure to fill openings within the EB Department in 2004: (1) bid notices listing the minimum qualifications for the job were posted; (2) interested applicants bid on the job by submitting the required materials to the personnel department; (3) the personnel department determined if a particular candidate was qualified; (4) the Department obtained a list of qualified applicants; (5) the Department configured an interview panel; (6) the interview panel conducted the interviews; (7) the commissioner approved the recommended individuals; (8) the list went back to personnel; and (9) the final hires were sent to main personnel.

---

testimony does not directly contradict his prior statements and create a "sham" issue of fact; rather, Sebastian's statements create an issue of credibility that is best left to the trier of fact. *See Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638-40 (7th Cir. 2004).

(Allen Resp. 56.1 ¶ 11; City Defs. Resp. 56.1 ¶ 11; Pl. 56.1 Resp., Ex. 15, Kozicki Dep. 182; Pl. 56.1 Resp., Ex. 20, Kaderbek Dep. 58-59; Allen 56.1 Resp., Ex. I, Kaderbek Dep. 70-75.)  In addition, Kaderbek, as Commissioner of the Department, signed a form certifying that, to the best of his understanding, political considerations did not play a role in the hiring decision. (Allen Resp. 56.1 ¶ 11; City Defs. Resp. 56.1 ¶ 11; Pl. 56.1 Resp., Ex. 21, Shakman Referral List/Certification.) Kaderbek retained final decision-making authority for employment decisions made within the Department.  (Allen Resp. 56.1 ¶ 11; City Defs. Resp. 56.1 ¶ 11.)  He was not, however, authorized to set policies or procedures regarding the hiring and/or firing of City employees and had no role in determining who would be interviewed, which candidates were eligible for interview, or how candidates were evaluated.  (Pl. Resp. 56.1 ¶ 81.)  The City's Department of Human Resources was responsible for establishing hiring-related policies and procedures.  (*Id.*)

In 2004, the EB Department posted three openings for supervising electrical inspectors.  (Pl. Resp. 56.1 ¶ 9.)  The minimum qualifications for the position included: (1) successful completion of an approved electrician apprentice training program supplemented by two years of journeyman experience, including one year of electrical inspection experience; (2) considerable knowledge of the laws, codes, and ordinances governing electrical installations; (3) considerable knowledge of the Code. (Pl. Resp. 56.1 ¶ 72.) Duties for the position included: (1) supervising and coordinating work assignments of electrical inspectors to ensure compliance with the building code; (2) supervising the inspection of electrical installation; (3) supervising the issuance of certain notices;  (4) meeting with inspectors, contractors, and the public to interpret building code requirements; (5) conducting field inspections to check quality of work;  (6) reviewing daily inspection reports; and (7) maintaining records and preparing reports. (*Id.*)  Additionally, when the employment decision was

governed by IBEW Collective Bargaining Agreement (the "CBA"), section 14.8 of the CBA required the City to "select the most qualified applicant" and, when "applicants [we]re equally qualified," to "select the most senior employee." (Allen Resp. 56.1 ¶ 12; City Defs. Resp. 56.1 ¶ 12; Pl. 56.1 Resp., Ex. 22, CBA.)

At some point after the positions became available, former Building Department Commissioner Norma Reyes appointed John Hammersmith ("Hammersmith") to serve as an Acting Supervisor until the EB Department supervisor positions were permanently filled. (Allen Resp. 56.1 ¶ 14; City Defs. Resp. 56.1 ¶ 14.) Sebastian believed that Mike Reynolds ("Reynolds") acted and served unofficially as an Acting Supervisor during the EB Department's supervisor hiring sequence.[5] (Allen Resp. 56.1 ¶ 14; City Defs. Resp. 56.1 ¶ 14; Pl. 56.1 Resp., Ex. 2, Sebastian Dep. 108-13.)

Sebastian, for the first time since he began working for the EB Department, applied for the supervising electrical inspector position by submitting an application. (Pl. Resp. 56.1 ¶ 10; Allen Resp. 56.1 ¶ 12; City Defs. Resp. 56.1 ¶ 13.) After submitting his application, Sebastian met with Allen to inform him that he had applied for the position (the "May 2004 conversation"). (Allen Resp. 56.1 ¶ 15; City Defs. Resp. 56.1 ¶ 15.) The parties dispute what occurred during the meeting. According to Sebastian, Sebastian met with Allen to provide him with his credentials for the promotion. (Allen Resp. 56.1 ¶ 15; City Defs. Resp. 56.1 ¶ 15; Pl. 56.1 Resp., Ex. 2, Sebastian Dep. 10-11, 46-49.) The first time Sebastian was deposed, he testified that, after he informed Allen of his qualifications, Allen told him, "Tom, you are Indian. You will never get promoted." (Pl. 56.1

---

[5] The parties also dispute whether Hammersmith and Reynolds made comments indicating that they would be promoted to the permanent supervisor position and whether Hammersmith claimed that the vacant position was his "spot" and that he was "supposed to get" the position. (Allen Resp. 56.1 ¶ 14; City Defs. Resp. 56.1 ¶ 14; Pl. 56.1 Resp., Ex. 25, Gibbons Dep. 108-10; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 63; Pl. 56.1 Resp., Ex. 12, Sebastian Dep. 108-09; City Defs. 56.1 Resp., Ex. M, Hammersmith Dep. ¶ 6; City Defs. 56.1 Resp., Ex. N, Reynolds Dep. ¶ 6.)

Resp., Ex. 2, Sebastian Dep. 10-11, 48.) Subsequently, the fourth time he was deposed, Sebastian testified that, Allen told him, "'Tom, you are Indian. You're never going to get promoted because you are not politically involved.'" (City. 56.1, Ex. I, Sebastian Dep. 693-94.)

Allen denies that he met with Sebastian to discuss Sebastian's qualifications and denies that he ever told Sebastian that Sebastian's national origin or political activity would impact his ability to obtain the promotion. According to Allen, Sebastian came to him, informed him that he was applying for the promotion, and told him that Patterson had told Sebastian that Sebastian was going to be promoted. (Allen Resp. 56.1 ¶ 15; City Defs. Resp. 56.1 ¶ 15; Pl. 56.1 Resp., Ex. 8, 190-94.) Sebastian then laid cancelled checks on Allen's desk and made comments regarding how he had contributed to political funds. (Allen Resp. 56.1 ¶ 15; City Defs. Resp. 56.1 ¶ 15; Pl. 56.1 Resp., Ex. 8, Allen Dep. 190-94.) Allen said that he told Sebastian to pick up the checks, displaying the checks was inappropriate, and that "none of [that] ha[d] anything to do with" who would be promoted. (Allen Resp. 56.1 ¶ 15; City Defs. Resp. 56.1 ¶ 15; Pl. 56.1 Resp., Ex. 8, 190-94.)

On May 23, 2004,[6] Sebastian sent a letter regarding his application to Kaderbek, copying Mayor Richard Daley, Sheila O'Grady (identified as Mayor Daley's Chief of Staff), and Alderman Bernard Stone (identified as "Building Committee Chairman"). (Pl. Resp. 56.1 ¶ 10.) In the letter, Sebastian identified himself as a candidate for the promotion, detailed his qualifications, and provided copies of his resume, work commendations, electrical licenses, and credentials. (Allen

---

[6] In Sebastian's combined response to Defendants' statements of fact, Sebastian admits that he sent the letter on May 23, 2004. In support of this assertion, Defendants cite to Sebastian Deposition Exhibit 31, which is a letter dated May 3, 2004, and to testimony from Sebastian in which he confirms that he sent the letter on or about May 23, 2004. (Pl. Resp. 56.1 ¶ 10; Allen 56.1, Ex. D, Sebastian Dep. Exs., Ex. 31.) In Allen's and the City Defendants' respective responses to Sebastian's statement of additional facts, Sebastian states and Defendants admit that Sebastian wrote a letter to Kaderbek on May 3, 2004 and ultimately sent it to Kaderbek and others. (Allen Resp. 56.1 ¶ 17; City Defs. Resp. 56.1 ¶ 17.) In support of this statement, Sebastian cites to a letter that is identical to Sebastian Deposition Exhibit 31. (Pl. 56.1 Resp. 27.) Thus, consistent with Sebastian's testimony, the Court assumes the letter was sent on or about May 23, 2004.

Resp. 56.1 ¶ 17; City Defs. Resp. 56.1 ¶ 17; Pl. 56.1 Resp., Ex. 27, May 5, 2004 Letter.)

<u>The Interviews</u>

The City determined that fifteen of the applicants, including Sebastian, Hammersmith, and Reynolds, were eligible for the interview. (Allen Resp. 56.1 ¶¶ 13, 28; City Defs. Resp. 56.1 ¶¶ 13, 28.) Kaderbek did not participate in the interview process; instead he delegated the interviews to Kozicki and other bureau chiefs. (Pl. Resp. 56.1 ¶ 80; Allen Resp. 56.1 ¶ 18; City Defs. Resp. 56.1 ¶ 18; Pl. 56.1 Resp., Ex. 20, Kaderbek Dep. 34.) On the evening of July 26, 2004, Kozicki called Allen and informed Allen that he would be participating in the interviews alongside Kozicki. (Pl. Resp. 56.1 ¶¶ 11-12.)

Kaderbek expected Kozicki to use a standard written list of questions for all of the interviews to ensure that the interviews remained impartial. (Allen Resp. 56.1 ¶ 18; City Defs. Resp. 56.1 ¶ 18; Pl. Resp. 56.1, Ex. 20, Kaderbek Dep. 43-47.) At Kozicki's request, Allen prepared a list of eight questions to test the applicants' technical knowledge of the Code and a "quick template" that listed brief answers to the questions (the "Code questions"). (Pl. Resp. 56.1 ¶ 11; Allen Resp. 56.1 ¶ 19; City Defs. Resp. 56.1 ¶ 19.) Allen based the answers on the template solely on his personal knowledge of the Code. (Allen Resp. 56.1 ¶ 19; City Defs. Resp. 56.1 ¶ 19.) The interviews took place on July 27, 2004 and August 3, 2004. (Pl. Resp. 56.1 ¶ 12.) Kozicki and Allen conducted the July 27th interviews, while Kozicki and Kevin Bush ("Bush"), then a Deputy Commissioner in the EB Department, conducted the August 3rd interviews. (*Id.*) Allen was the only individual on any of the interview panels who had electrical experience or knowledge of the Code. (Def. Allen 56.1 Resp. ¶ 21; City Defs. 56.1 Resp. ¶ 21.) As a result, Kozicki relied on Allen and Bush and asked them how the candidates performed to determine whether the applicants answered the Code

questions correctly.  (Def. Allen 56.1 Resp. ¶ 21; City Defs. 56.1 Resp. ¶ 21; Pl. Ex. 15, Kozicki Dep. 198-201, 209.)

Sebastian was one of eleven candidates interviewed by Kozicki and Allen on July 27.  (Pl. Resp. 56.1 ¶¶ 12, 15.)  Kozicki first asked each candidate a series of non-technical questions relating to the candidate's qualifications, ideas, and opinions about the Department.  (Pl. 56.1 Resp. ¶ 14.)  The parties dispute some details regarding the interviews, such as the length of time of each interview, whether the applicants were given the Code questions to review, and whether Kozicki and Allen took notes during all of the interviews.  (Allen 56.1 Resp. ¶¶ 22, 24-25; City Defs. 56.1 Resp. ¶¶ 22, 24-25.)  They dispute whether Allen asked Sebastian all eight Code questions, whether he asked Sebastian different technical questions as compared to other candidates, and whether he and Kozicki took notes regarding Sebastian's answers.  (Def. Allen 56.1 Resp. ¶¶ 24-25; City Defs. 56.1 Resp. ¶¶ 24-25; Sebastian Dep. 57-66, 103-06; Allen 56.1 Resp., Ex. H, Interview Evaluations; Ex. J, George Dep. 23-33.)   Sebastian believes that Allen asked him different questions than those included on the Code questions list.  (Def. Allen 56.1 Resp. ¶ 25; City Defs. 56.1 Resp. ¶ 25; Sebastian Dep. 103-06.)  Allen told Kozicki that Sebastian provided incorrect answers to a few of the Code questions. (Allen Resp. 56.1 ¶ 27; City Defs. Resp. 56.1 ¶ 27.)  Kozicki and Allen did not ask Sebastian any questions regarding his political activities or lack thereof during the interview. (Pl. Resp. 56.1 ¶ 79.)

Kozicki formulated his own opinions and then  held a meeting with Bush and Allen during which the three men discussed their opinions and came to a conclusion as to who the best candidates were.  (Def. Allen Resp. 56.1 ¶ 26; Def. City Defs. Resp. 56.1 ¶ 26; Pl. 56.1 Ex. 15, Kozicki Dep.

194-96, 247-52.) Kozicki then rated the candidates. (Pl. 56.1 Ex. 15, Kozicki Dep. 194-96, 247-52.) Allen denies that he attended the meeting. (Pl. 56.1 Resp. ¶ 16.) Allen says that he completed his score sheets immediately after they completed the interviews on July 27, 2004 and never met with Kozicki, Kaderbek or Bush regarding the scoring. (*Id.*)

The three interviewers used standardized forms to rate the candidates for the supervisor position on a scale of one through five in the following four categories: (1) training; (2) experience; (3) communication skills; and (4) technical knowledge. (Pl. Resp. 56.1 ¶ 13.) Each category was to be equally weighted. (Pl. Resp. 56.1 ¶ 13; City Defs. Resp. 56.1 ¶ 18; Allen 56.1, Ex. H.) While the interviewers for the 2004 supervisor promotions could have looked at "anything" when evaluating the candidates, they did not review the candidates' applications or disciplinary histories. (City Defs. 56.1 Resp. ¶ 26; Allen 56.1 Resp. ¶ 26.)

Of the eleven candidates interviewed on July 27, 2004, Allen evaluated Sebastian at an overall average score of 2.75, which placed Sebastian eleventh out of the eleven candidates interviewed on that date. (Pl. 56.1 Resp. ¶ 15.) Kozicki evaluated Sebastian at an overall average score of 3.25, placing him at a tie for eighth out of the eleven people interviewed on July 27, 2004 and tenth out of the fifteen total candidates. (*Id.*) Bush did not interview Sebastian or any of the three successful candidates. (Pl. Resp. 56.1 ¶ 18.) Ultimately, when the scores were tallied and averaged, Sebastian tied with three other candidates for the lowest average score of 3.0. (*Id.*)

Allen and Kozicki had each ranked the three successful candidates – Reynolds, Hammersmith, and Keith Hall ("Hall") – as first, second, and third. (Def. Allen Resp. 56.1 ¶ 28; Def. City Defs. Resp. 56.1 ¶ 28; Pl. 56.1 Resp. ¶ 18.) The three individuals received the three

highest scores and, ultimately, the promotion. (Def. Allen Resp. 56.1 ¶ 28; Def. City Defs. Resp. 56.1 ¶ 28.) While Kozicki, Allen, and Bush gave different technical ability scores for more than half of the unsuccessful candidates, Kozicki and Allen both gave Hammersmith, Reynolds, and Hall perfect "5" ratings for technical knowledge. (Allen Resp. 56.1 ¶ 27; City Defs. Resp. 56.1 ¶ 27; Allen 56.1 Resp., Ex. H.) Allen gave Sebastian a score of "2" on the technical knowledge portion. (Allen Resp. 56.1 ¶ 27; City Defs. Resp. 56.1 ¶ 27; Allen 56.1 Resp., Ex. H.)

Kaderbek approved the 2004 promotions, relying on the recommendations of the individuals who interviewed the candidates. (Pl. 56.1 Resp. ¶ 80.) Typically, Kaderbek would review the documents in the packet as well as the numerical ratings and identify the three candidates with the highest average scores. (Pl. Resp. 56.1 ¶ 17; Allen 56.1 Resp., Ex. I, Kaderbek Dep. 70-73.) Kaderbek would then sign, date, and send a referral list and final employment decision form to Mary Ann Ciaravino[7] ("Ciaravino"). (Pl. Resp. 56.1 ¶ 17; Allen 56.1 Resp., Ex. I, Kaderbek Dep. 70-85.) Upon receipt of this form, Ciaravino would generate letters informing the candidates whether or not they had been selected. ( Allen 56.1 Resp., Ex. I, Kaderbek Dep. 78-79.) On or about August 19, Kozicki gave Ciaravino a document that listed the numerical scoring results from the July 27 and August 3 interviews. (Allen Resp. 56.1 ¶ 28; City Defs. Resp. 56.1 ¶ 28.) The referral

_____

[7] The parties dispute whether Ciaravino occupied the role of Director of Personnel or Director of Administration for the Department. (City Defs. 56.1 Resp. ¶ 30; Allen 56.1 Resp. ¶ 30.) In their Rule 26(a)(1)(a) disclosure, the City Defendants initially identified Ciaravino as an individual who likely possessed "knowledge regarding the procedures followed in filling open positions, including those sought by Sebastian." (City Defs. 56.1 Resp. ¶ 30; Allen 56.1 Resp. ¶ 30.) Allen subsequently adopted this disclosure by reference. (City Defs. 56.1 Resp. ¶ 30; Allen 56.1 Resp. ¶ 30.) At her deposition, Ciaravino asserted her Fifth Amendment right against self incrimination and refused to answer any substantive questions posed to her about the procedures followed in filling open positions within the Department and the specific promotion decisions at issue in the current action. (City Defs. 56.1 Resp. ¶ 30; Allen 56.1 Resp. ¶ 30.) Ciaravino was granted immunity to testify in the *United States v. Sorich* criminal trial. (City Defs. 56.1 Resp. ¶ 30; Allen 56.1 Resp. ¶ 30.)

list and final employment decision form that Kaderbek gave to Ciaravino also noted a date of August 19, 2004 next to Kaderbek's signature. (Allen 56.1 Resp., Ex. I, Kaderbek Dep. 85-86, Kaderbek Dep. Ex. 5.) While Kaderbek speculated that he gave the referral list and final employment decision form to Ciaravino on August 19, 2004, he also testified that the date did not appear to be in his handwriting and he had no reason - one way or another - to doubt the accuracy of the date. (Allen 56.1 Resp., Ex. I, Kaderbek Dep. 85-86, Kaderbek Dep. Ex. 5; City Defs. 56.1 Resp, Ex. T, Kaderbek Dep. 223-25.) However, the letters notifying Hammersmith, Hall, and Reynolds that they received the supervisor promotion, which were signed by Kaderbek, are dated August 18, 2004. (Allen Resp. 56.1 ¶ 28; City Defs. Resp. 56.1 ¶ 28; Pl. 56.1 Resp., Ex. 33, Supervisor Promotion Letters.) Ciaravino asserted her Fifth Amendment right when asked whether "the letters, advising Mr. Reynolds, Hammersmith and Hall that they were getting the job, went out a day before Mr. Kozicki ever gave you the scores and the results from the interviews for these jobs isn't that right?" (Allen 56.1 Resp. ¶ 29; City Defs. 56.1 Resp. ¶ 29.) Allen had no communication with Ciaravino regarding the 2004 supervisor promotions. (Pl. 56.1 Resp. ¶ 16.)

<u>Defendants' Scoring Explanations</u>

In his deposition, Kozicki explained that he sought someone with knowledge of the Code who could "handle themselves well on their feet," handle pressure and stress, communicate well with the inspectors, and "get things done" in a "very high stressed environment" and "a difficult job." (Pl. Resp. 56.1 ¶ 73.) He did not look at any of the candidates' discipline files. (*Id.*) Kozicki said that Sebastian "did a very poor job in the interview" and answered questions poorly. (Pl. Resp. 56.1 ¶ 74.) Kozicki knew that Sebastian was a sign inspector and believed that "the perception in

the [D]epartment" was that sign inspectors were not considered to be as "good" as general electrical inspectors. (*Id.*) In contrast, Kozicki testified that, among other things: (1) Hall interviewed well; (2) Kozicki believed that Hammersmith was a hard worker, Hammersmith was familiar with all of the aspects of the departments because he had worked in three different bureaus, and others within the Department thought well of him; and (3) Reynolds "[g]ave an excellent interview," "handled himself well," used examples well during the interview, had years of experience in management, and had done an excellent job in the Certificate of Occupancy unit. (Pl. Resp. 56.1 ¶ 75.)

Allen stated that he rated each candidate in terms of training, experience, communication skills, and technical knowledge. (Pl. Resp. 56.1 ¶ 76.) He took into account the responsiveness and quality of each candidate's responses to the non-technical questions and the accuracy of their responses to the technical questions. (*Id.*) Because the successful candidates would be reporting directly to him, he was mindful of each candidate's ideas about improving the Department and ability to efficiently lead and manage the inspectors. (*Id.*) Allen stated that Sebastian answered some of the technical questions incorrectly and did not "respond directly and fully to several technical questions" or provide concrete examples of his experiences with and ideas for the Department, although he was specifically asked to do so. (Pl. Resp. 56.1 ¶ 77.)

In contrast, Allen stated that Hammersmith, Reynolds, and Hall performed better than Sebastian during their respective interviews. (Pl. Resp. 56.1 ¶ 78.) According to Allen, the other candidates interacted with the interviewers and conveyed their ideas for the Department. (*Id.*) Based on their performance, Allen believed that Hammersmith, Hall, and Reynolds would be better able to understand Department operations on a larger scale and to manage other employees, as

compared to Sebastian. (*Id.*)

<u>The Promoted Individuals</u>

Shortly before his promotion, Hammersmith worked as an electrical inspector in the Certificate of Occupancy team task force.[8]  (Allen 56.1 Resp. ¶ 31; City Defs. 56.1 Resp. ¶ 31.)   In either the late 1970's or early 1980's, Hammersmith took, but did not pass, the Supervising Electrician's License Code exam.  (Allen 56.1 Resp. ¶ 31; City Defs. 56.1 Resp. ¶ 31; City Defs. 56.1 Resp., Ex. B, Hammersmith Dep. 131.)   Hammersmith has not attempted to obtain a license because he believes it is a "conflict of interest" to hold the license and work for the EB Department. (City Defs. 56.1 Resp., Ex. B, Hammersmith Dep. 131.)

Hammersmith grew up in "the same area" as Allen's family.  (Allen 56.1 Resp. ¶ 32; City Defs. 56.1 Resp. ¶ 32; Pl. 56.1 Resp., Ex. 24, Hammersmith Dep. 88-89; City Defs. 56.1 Resp., Ex. M, Hammersmith Dep. ¶ 4.)   Hammersmith met Alderman Allen for the first time at a party some time between 2004 and 2006.  (Allen 56.1 Resp. ¶ 32; City Defs. 56.1 Resp. ¶ 32; Pl. 56.1 Resp., Ex. 24, Hammersmith Dep. 88-89.)  Hammersmith has a long history of performing political work for Alderman Allen's campaigns, Allen's former alderman father-in-law, and certain candidates endorsed by the Local 134 electrician's union.  (Allen 56.1 Resp. ¶ 32; City Defs. 56.1 Resp. ¶ 32; Pl. 56.1 Resp., Ex. 24, Hammersmith Dep. 8-16, 88-92.)  Hammersmith has signed petitions,

---

[8] In his statement of additional facts, Sebastian asserts that Hammersmith "did not work in the more complicated plan review function nor sign inspections."  (City Def. 56.1 Resp. ¶ 31; Allen 56.1 Resp. ¶ 31.)  In support of this statement, Sebastian cites to Hammersmith's 2004 bid application as well as Sebastian's own belief regarding Hammersmith's prior experience.  (*Id.*)  Neither source properly supports his assertion.  Hammersmith's bid application provides no indication that Hammersmith had not previously performed these tasks.  (Pl. 56.1 Resp., Ex. 37, Hammersmith Bid Application.)  Further, Sebastian has failed to lay the proper foundation to establish that he had the requisite personal or firsthand knowledge.  *See* Fed. R. Evid. 602.  Thus, the Court will not consider this assertion, or any other fact based on similarly deficient evidence, for the purposes of summary judgment.

contributed money, put campaign signs on his lawn, walked in parades, and walked picket lines. (Allen 56.1 Resp. ¶ 32; City Defs. 56.1 Resp. ¶ 32.)  With respect to Alderman Allen specifically, Hammersmith has passed out literature, signed petitions, worked the polls, and gone door to door. (Allen 56.1 Resp. ¶ 32; City Defs. 56.1 Resp. ¶ 32; Pl. Ex. 24, Hammersmith Dep. 87- 91.)

Reynolds joined the City in 2000 and worked in the Certificate of Occupancy unit until shortly before his promotion.  (Allen 56.1 Resp. ¶ 33; City Defs. 56.1 Resp. ¶ 33.)  Reynolds grew up in the same neighborhood as State Representative Kevin Joyce, son of Jeremiah Joyce, and has known him since the 1970's. (Allen 56.1 Resp. ¶ 34; City Defs. 56.1 Resp. ¶ 34; Pl. 56.1 Resp., Ex. 30, Reynolds Dep. 261-62.)  According to Sebastian, Jeremiah Joyce works as a political strategist for Mayor Daley.  ( Pl. 56.1 Resp., Ex. 12, Sebastian Dep. 52.)  Reynolds began his political activity in 2002. (Allen 56.1 Resp. ¶ 34; City Defs. 56.1 Resp. ¶ 34.)  In Fall 2005, Reynolds became a precinct captain for the 19th Ward.   (Allen 56.1 Resp. ¶ 34; City Defs. 56.1 Resp. ¶ 34; Pl. 56.1 Resp., Ex. 30, Reynolds Dep. 270.)  Reynolds was responsible for "get[ting] the vote out" in his precinct and working for the candidates endorsed by the 19th Ward.  (Allen 56.1 Resp. ¶ 34; City Defs. 56.1 Resp. ¶ 34; Pl. 56.1 Resp., Ex. 30, Reynolds Dep. 263, 286.)  In 2006, Reynolds coordinated the South Side Irish parade. (Allen 56.1 Resp. ¶ 34; City Defs. 56.1 Resp. ¶ 34.)

Hall is an ordained associate minister at the Apostolic Faith Church in Chicago.  (Allen 56.1 Resp. ¶ 35; City Defs. 56.1 Resp. ¶ 35; Pl. 56.1 Resp., Hall Dep. 270.)  Hall testified that there have been a few occasions when elected officials have been in attendance at the church.  (Allen 56.1 Resp. ¶ 35; City Defs. 56.1 Resp. ¶ 35; Pl. 56.1 Resp., Hall Dep. 270-72.)  Specifically, Hall recalled that State Senator Barack Obama attended a church service "a number of years ago" (before

becoming a senator), as did Alderwoman Dorothy Tillman at some point. (Allen 56.1 Resp. ¶ 35; City Defs. 56.1 Resp. ¶ 35; Pl. 56.1 Resp., Hall Dep. 270-72; Allen 56.1, Ex. JJ 406-07.) In addition, while a number of Local 134 electricians (fewer than ten) have attended his church, Hall is not aware of any Department employees who have been in attendance. (Allen 56.1 Resp. ¶ 35; City Defs. 56.1 Resp. ¶ 35; Pl. 56.1 Resp., Hall Dep. 316-17.) In the mid-90's, Hall volunteered to do some political work, which included knocking on doors and handing out flyers, for a candidate named "Lightfoot." (Allen 56.1 Resp. ¶ 35; City Defs. 56.1 Resp. ¶ 35; Pl. 56.1 Resp., Hall Dep. 262, 264.) Hall took the Supervising Electrician's License Code exam on one occasion, but did not pass. (Allen 56.1 Resp. ¶ 37; City Defs. 56.1 Resp. ¶ 37; Pl. 56.1 Resp., Ex. 3, Hall Dep. 344-45.)

Sebastian previously provided Hall with a training (lasting no more than one day) regarding sign inspections. (Allen 56.1 Resp. ¶ 38; City Defs. 56.1 Resp. ¶ 38; Pl. 56.1 Resp., Ex. 2, Sebastian Dep. 160-61.) Sebastian also claims that he trained Hammersmith, Reynolds, and Allen; the City denies this. (Allen 56.1 Resp. ¶ 38; City Defs. 56.1 Resp. ¶ 38; Pl. 56.1 Resp., Ex.4, Bailey Dep. 90-92; City Defs. 56.1 Resp., Ex. J, Allen Dep. 100; City Defs. 56.1 Resp., Ex. M, Hammersmith Aff. ¶ 12; City Defs. 56.1 Resp., Ex. N, Reynolds Aff. ¶ 9.)

Sebastian's EEOC Charge and Subsequent Events

On August 24, 2004, Sebastian was notified that he did not receive the supervising electrical inspector position. (Pl. 56.1 Resp. ¶ 21; Allen 56.1, Ex. E, Sebastian Dep. Ex. 37.) Two days later, on August 26, he sent a letter to Michael Fitzgerald ("Fitzgerald"), identified as a business manager for IBEW, requesting to file a grievance and alleging that he had been discriminated against on

account of his national origin because he had not been promoted. (Pl. 56.1 Resp. ¶ 22; Allen 56.1, Ex. E, Sebastian Dep. Ex. 38.) Sebastian copied Michael Nugent ("Nugent") (identified as an IBEW business agent) and Gary Parks ("Parks") (identified as an IBEW union steward) on the letter. (Pl. 56.1 Resp. ¶ 22; Allen 56.1, Ex. E, Sebastian Dep. Ex. 38.)

On August 30, 2004, Sebastian sent a letter to Kaderbek – with copies to Mayor Richard Daley, Sheila O'Grady, Gene Lee ("Lee") (identified as Mayor Daley's Deputy Chief of Staff), Alderman Bernard Stone (identified as Buildings Committee Chairman), Ciaravino, and the IBEW – alleging that he had not been promoted because he was Asian American. (Pl. 56.1 Resp. ¶ 23; Allen 56.1, Ex. E, Sebastian Dep. Ex. 39.) In response, Lee contacted and subsequently met with Sebastian. (Pl. 56.1 Resp. ¶ 24.) During the meeting, the two discussed Sebastian's qualifications and Sebastian voiced his concerns that he had been discriminated against on account of his national origin. (Pl. 56.1 Resp. ¶ 24; Allen 56.1, Ex. A, Sebastian Dep. 118-22.)

On September 8, 2004, Sebastian informed Allen that he planned to file a union grievance regarding his failure to be promoted. (Pl. 56.1 Resp. ¶ 22.) Allen encouraged him to do so. (*Id.*) With Parks's assistance, Sebastian prepared a formal union grievance, which he filed on September 10, 2004. (*Id.*) After the grievance was processed and denied, the union declined its option under the CBA to pursue arbitration. (*Id.*)

<u>Alleged Retaliation</u>

On September 17, 2004, Sebastian filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been denied a promotion on the basis of his race (Asian) and national origin (Indian) ("EEOC charge"). (Pl. 56.1 Resp. ¶ 25.)

19

Sebastian claims that, subsequent to the EEOC charge and as a result of this charge (as well as his April 2005 lawsuit), the City engaged in a number of retaliatory acts. The following is a timeline of the events that occurred subsequent to the filing of his EEOC charge, placing the alleged retaliatory acts in the context of the EEOC investigation as well as the progression of his lawsuit.

On September 29, 2004, Scott Loeff ("Loeff"), the City's Assistant Commissioner of Labor Relations, sent the EEOC charge to Kozicki via email and copied Kaderbek. (City Defs. 56.1 Resp. ¶ 71; Allen 56.1 Resp. ¶ 71; (Pl. 56.1 Resp. ¶ 45; Pl. 56.1 Resp., Ex. 51, Kozicki Sept. 29, 2004 E-mail; City Defs. 56.1 Resp., Ex. FF, Loeff Aff. ¶ 3.) Nine days later, on October 8, 2004, Allen assigned Sebastian to work on the strategic task force ("STF") for the first time.[9] (City Defs. 56.1 Resp. ¶ 71; Allen 56.1 Resp. ¶ 71; Pl. 56.1 Resp. ¶ 35.) STF was one of several projects in which electrical and other types of inspectors in the Department were assigned as a team to complete field inspections of different classes of buildings. (Pl. 56.1 Resp. ¶ 34.) The teams often went to dangerous areas in the City and, when necessary, were accompanied by armed police officers. (City Defs. 56.1 Resp. ¶ 72; Allen 56.1 Resp. ¶ 72. ) While some electrical inspectors considered STF work safer than solo field inspections because they worked with a team and police escorts, others considered the work dangerous and a punishment. (City Defs. 56.1 Resp. ¶ 72; Allen 56.1 Resp. ¶ 72; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 188-89; Pl. 56.1 Resp., Ex. 52, Browning Dep. 28-29; City

_____

[9] In their respective responses to Sebastian's statement of additional facts, Allen and the City Defendants deny that this was Sebastian's first STF assignment. Defendants affirmatively assert that Sebastian previously worked "court case team inspection[s]" at an unspecified time and that this type of inspection is a function of STF. (City Defs. 56.1 Resp. ¶ 71; Allen 56.1 Resp. ¶ 71.) In support of the latter assertion, Defendants cite to the deposition of Steven Browning ("Browning"), in which Browning explained that, in an unspecified time frame, STF had a "court team." (City Defs. 56.1 Resp., Ex. CC, Browning Dep. 77.) Defendants provide no evidence to support the proposition that the "court case team inspection" performed by Sebastian was performed in conjunction with the "court team" that the STF maintained during the unspecified time frame discussed by Browning. Thus, the Court deems this fact admitted for the purposes of summary judgment. See L.R. 56.1.

Defs. 56.1 Resp., Ex. AA, Simmons Dep. 86-87; City Defs. 56.1 Resp., Ex. G, Cunningham Aff. ¶ 11, Gallagher Aff. ¶ 12, Podbielski Aff. ¶ 12.)

On January 12, 2005, EEOC investigator Joshua George ("George") conducted a phone interview with Sebastian regarding the EEOC charge. (Pl. 56.1 Resp. ¶¶ 26-28; Allen 56.1, Ex. J, George Dep. 21-33.) During the interview, Sebastian admitted to giving certain answers contained in Allen's notes. (Pl. 56.1 Resp. ¶ 28; Allen 56.1, Ex. J, George Dep. 21-33.)

On April 8, 2005, Sebastian filed his original complaint in the United States District Court for the Northern District of Illinois, alleging race and national origin discrimination[10] (the "First Complaint"). (Pl. 56.1 Resp. ¶ 30.)

Over two months later, on June 15, 2005, Sebastian attended a predisciplinary hearing with Nugent, Loeff, Hall, and Allen regarding Sebastian's failure to report to work on June 10, 2005, a day he was assigned to work STF ("June 2005 predisciplinary hearing"). (Pl. 56.1 Resp. ¶ 45.) Because Sebastian produced evidence that he had visited a doctor on June 10, Loeff determined that no violation of City policy had been established. (*Id.*) Sebastian did not receive a reprimand or other sanction as a result of the incident. (*Id.*)

On July 1, 2005, the last work day preceding the Independence Day holiday in 2005, Sebastian worked a "skeleton crew" shift from 2:00 p.m. to 3:30 p.m. (City Defs. 56.1 Resp. ¶ 82; Allen 56.1 Resp. ¶ 82; Pl. 56.1 Resp. 46.) The "skeleton crew" is a group of employees that remains at work for approximately one to one and one-half hours (to finish a normal work day) when the City grants early dismissal to a majority of the employees on days preceding major holidays. (Pl. 56.1

---

[10] This case was originally assigned to another district court judge, but was transferred to this Court as part of its Initial Calendar.

Resp. ¶ 46.)   Sebastian claims he was assigned to work the shift by Allen; Allen claims he

volunteered. (City Defs. 56.1 Resp. ¶ 82; Allen 56.1 Resp. ¶ 82; City Defs. Ex. V, Reynolds Dep.

218-19; Pl. 56.1 Resp., Ex. 12, 126-30.)   Non-supervisory EB Department inspectors Cheryl

Palombizio ("Palombizio"), Dan Lynch, and Tom Podbielski worked the skeleton crew shift on the

preceding Christmas Eve 2003, New Year's Eve 2003, and July 4, 2004, respectively.[11]   (Pl. 56.1

Resp. ¶ 46.)

        According to the Department's general rules, sign inspectors are permitted to spend only one

day each week in the Department's offices and must spend the remaining four days in the field

conducting inspections.  (Pl. 56.1 Resp. ¶ 48.)  At some point in October 2005, Hammersmith

approached Sebastian and instructed Sebastian to leave the office to begin his field work.  (Pl. 56.1

Resp. ¶ 49.)  Sebastian told Hammersmith that he needed another thirty minutes to complete his

paperwork, which Hammersmith permitted.  (*Id.*)

        In late 2005 or early 2006, Sebastian attended an informal meeting with Bush, Hall, and

Allen regarding an incident in which Hall had informed Sebastian that Sebastian was assigned to

STF the following day and Sebastian responded that he could not work STF because he was taking

a sick day for a doctor's appointment.  (Pl. 56.1 Resp. ¶ 52.)  Sebastian did not submit a sick time

request slip for the doctor's appointment prior to advising Hall that he could not work STF because

he was taking the day off.  (*Id.*)  No discipline resulted from the incident.  (*Id.*)

        At some point in 2006, Hall approached Sebastian when Sebastian was in the office for his

_____

        [11] In his 56.1(b)(3)(B) Statement of Facts, Sebastian submits that he was the only non-supervisory employee
assigned to work the skeleton crew since Allen became Chief Electrical Inspector.  (City Defs. 56.1 Resp. ¶ 82; Allen
Defs. 56.1 Resp. ¶ 82.)  This proposition is not supported by Sebastian's citation to the record, which indicates that three
non-supervisory employees were assigned to "skeleton crew" from the time Allen became Chief Electrical Inspector in
October 2003.  Thus, the Court will not consider this statement.  *See* L.R. 56.1.

second day in one week and instructed Sebastian to report to work in the field. (Pl. 56.1 Resp. ¶ 50.)

When Sebastian told Hall that he had paperwork to complete, Hall allowed him to stay in the office

with the understanding that the day would be Sebastian's last office day for the week. (*Id.*.)

From October 2004 until April 2006, Sebastian, as well as other electrical inspectors, were

periodically assigned to work STF on several occasions. (Pl. 56.1 Resp. ¶ 36.) At some point during

the interim, Sebastian complained to Allen that sign inspectors with less seniority should be assigned

to work STF. (*Id.*) As a result, Allen assigned two less-senior sign inspectors – Bernard Simmons

and Glenn Ford – to work on STF in rotation with Sebastian. (*Id.*)

On January 10, 2006 at 9:05 a.m., Allen directed Hall to assign Sebastian to STF that day

because the permanently assigned STF inspector was unavailable to work. (City Defs. 56.1 Resp.

¶ 73; Allen 56.1 Resp. ¶ 73.) Approximately two months later, on March 7, 2006, Allen sent an

email to EB supervisors requesting that they select an inspector to work STF the following day.

(City Defs. 56.1 Resp. ¶ 74; Allen 56.1 Resp. ¶ 74.) Sebastian was selected and the parties dispute

how he was selected. (City Defs. 56.1 Resp. ¶ 74; Allen 56.1 Resp. ¶ 74; Allen 56.1 Resp., Ex. B,

Sebastian Dep. 164; City Defs. 56.1 Resp., Ex. B, Allen Aff. ¶ 8.)

On March 22, 2006, this Court granted Sebastian leave to file an amended complaint in

which he alleged, for the first time, that the City retaliated against him in violation of Title VII by,

among other things, assigning him to STF. (City Defs. 56.1 Resp. ¶ 75; Allen 56.1 Resp. ¶ 75.)

On April 7, 2006, Allen issued a memorandum in which he first announced that the EB would rotate

inspectors to perform STF inspections. (City Defs. 56.1 Resp. ¶ 75; Allen 56.1 Resp. ¶ 75.)

According to the rotating schedule, inspectors from all bureaus and assignments in the Department

would work STF in two-week shifts.  (Pl. 56.1 Resp. ¶ 37.)  Sebastian admitted that, from the time

that he complained to Allen about the lack of less-senior inspectors assigned to STF through April

2006, Allen rotated sign inspectors, but not other inspectors, on the STF assignment.[12]   (City Defs.

56.1 Resp. ¶ 75; Allen 56.1 Resp. ¶ 75; Allen 56.1 Resp., Ex. B, Sebastian Dep. 148-52.)

On April 14, 2006, Sebastian filed a First Amended Complaint, alleging race and national

origin discrimination, retaliation, and violation of Sebastian's First Amendment right to freedom of

association.  (Pl. 56.1 Resp. ¶ 31; First Am. Compl.)

In November 2006, Sebastian requested to change an office day from Friday to Thursday.

(Pl. 56.1 Resp. ¶ 50.)  While Hall refused his request, he allowed Sebastian to take compensatory

time off from work on the Friday at issue.  (*Id.*)

For the purposes of assigning sign inspections, the Department divides the area within the

City limits into thirty-nine districts.  (Pl. 56.1 Resp. ¶ 60.)  Each sign inspector in the Department

covers several districts.  (*Id.*)  In late 2006 or early 2007, Hall advised Sebastian to cover a new

district because Palombizio began performing sign inspections in District 4, a district that both

Sebastian and Palombizio had covered in the past.  (*Id.*)

---

[12]  In his 56.1(b)(3)(B) Statement of Facts, Sebastian submits that, "[n]o electrical inspector who interviewed
for the supervisor position - excluding Martin Willis who was permanently assigned to STF - was assigned to work more
STF inspections than Sebastian."  (City Defs. 56.1 Resp. ¶ 76; Allen 56.1 Resp. ¶ 76.)  In support of this statement,
Sebastian cites to his own affidavit, in which he states that he has reviewed the EB Department STF time sheets produced
by the City as well as his time sheets.  (Pl. 56.1 Resp., Ex. 76, Sebastian Aff. ¶ 1.)  Attached to affidavit as "Exhibit A"
is a chart, presumably created by Sebastian, that allegedly lists the number of STF days worked by all of the 2004
supervisor candidates, as reflected in the time sheets produced by the City.  (Pl. 56.1 Resp., Ex. 76, Sebastian Aff. ¶ 2,
Ex. A.)  Sebastian has failed to lay a proper foundation as to the admissibility of the documents upon which the chart
is allegedly based or to show that the summary is accurate.  *See Judson Atkinson Candies, Inc. v. Latini-Hohberger
Dhimantec*, Nos. 07-1660, 07-2116, 2008 U.S. App. LEXIS 11771, at *21 (7th Cir. June 3, 2008) (*quoting United States
v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir. 1990)) ("The admission of a summary under Fed. R. Evid. 1006 requires 'a
proper foundation as to the admissibility of the material that is summarized and . . . [a showing] that the summary is
accurate.'").

On or about February 15, 2007, Tom Ryan, a supervisor in the Department, shouted at Sebastian and told Sebastian as well as EB Department inspector Don Gibson ("Gibson") that they should not discuss "personal matters" during work time. (Pl. 56.1 Resp. ¶ 65.)

On February 22, 2007, Sebastian attended an informal meeting with Hall and Allen, where he received a verbal warning regarding the length of time it took for him to respond to a February 5, 2007 call on his mobile work phone. (Pl. 56.1 Resp. ¶ 61.) The parties dispute whether Hall had the authority to issue this verbal warning. (City Defs. 56.1 Resp. ¶ 79; Allen 56.1 Resp. ¶ 79.) Nevertheless, Allen, rather than Hall, gave the verbal warning. (City Defs. 56.1 Resp. ¶ 79; Allen 56.1 Resp. ¶ 79.) On February 23, 2007, Sebastian wrote a letter to Allen, copying several others, regarding the verbal warning. (Pl. 56.1 Resp. ¶ 61.) In the letter, Sebastian asked Allen to obtain the phone records regarding the timing of when Sebastian received and responded to Hall's calls.[13] (City Defs. 56.1 Resp. ¶ 78; Allen 56.1 Resp. ¶ 78; Pl. 56.1 Resp., Ex. 61, Sebastian Feb. 23, 2007 Letter.) Sebastian did not lose any compensation, assignments, or employment opportunities as a result of this incident or the verbal warning. (Pl. 56.1 Resp. ¶ 61.)

On the afternoon of March 15, 2007, Hall received an emergency call regarding a dangerous sign flapping from a high rise (the "March 15, 2007 incident"). (Pl. 56.1 Resp. ¶ 62.) Hall called

---

[13] Sebastian further maintains that Allen never asked Hall to verify the timing, nor did he obtain the phone records. Sebastian fails to support this proposition with a citation to the record and, therefore, the Court will not consider the statement. The Court further notes that, in their respective responses to Sebastian's statement of facts, Defendants denied that Allen never asked Hall to substantiate the timing and, citing to affidavits by Allen and Loeff, affirmatively stated that Allen forwarded Sebastian's request to Loeff, who subsequently obtained the phone records and confirmed Sebastian's delayed response. (City Defs. 56.1 Resp. ¶ 79; Allen 56.1 Resp. ¶ 79.) Sebastian then countered with arguments as to why Loeff's investigation provides further evidence of retaliation (namely, a statement from Sebastian's attorney during Loeff's deposition that Defendants never produced any such phone records). (Pl. Sur-response Mem. 13-14.) In light of the Court's conclusion not to consider Sebastian's unsupported assertion that Hall did not fulfill Sebastian's request for verification and resulting failure to create a dispute of fact, the Court need not and will not consider the additional extrinsic evidence submitted by the parties in support of their respective positions.

Sebastian, who was in the field, and asked him to investigate the sign immediately.[14]  (*Id.*)
According to Hammersmith, in an emergency situation, they "may" pull the inspector closest to the
area to respond.  (City Defs. 56.1 Resp. ¶ 80; Allen 56.1 Resp. ¶ 80; Pl. 56.1 Resp., Ex. 24,
Hammersmith Dep. 75.)  Sebastian went to the scene, communicated with Hall over his radio, left
the scene, and clocked out at approximately 3:47 p.m.  (Pl. 56.1 Resp. ¶ 62.)  Seeking further
information regarding the state of the emergency situation, Hall called Sebastian at approximately
5:00 p.m.  (*Id.*)  The next morning, Hall requested that Sebastian prepare a report regarding the
emergency situation.  (Pl. 56.1 Resp. ¶ 63.)   After Sebastian prepared the report, Allen called
Sebastian to a meeting with Bush and Hall, where he was questioned regarding details not contained
in the report.  (Pl. 56.1 Resp. ¶ 63; Allen 56.1 Resp., Ex. C, Sebastian Dep. 337-38.)  On March 19,
2007, Sebastian wrote a letter regarding the March 15, 2007 incident[15] to Jamia McDonald, the
acting Commissioner of the Department, copying several others.  (Pl. 56.1 Resp. ¶ 63.)

On April 27, 2007, Sebastian requested two days of educational leave in May to attend a
seminar.  (Pl. 56.1 Resp. ¶ 56; City Defs. 56.1 Resp. ¶ 89; Allen 56.1 Resp. ¶ 89.)  Allen forwarded
the request to Bush, who did not approve the request. (City Defs. 56.1 Resp. ¶ 89; Allen 56.1 Resp.
¶ 89.)  Bush subsequently told Allen that he did so because Sebastian had previously failed to attend

---

[14] In his 56.1(b)(3)(B) Statement of Facts, Sebastian submits that, when Hall dispatched Sebastian to the
emergency, there were at least five other inspectors who were positioned closer than Sebastian to the scene of the
emergency and could have attend the emergency.  (City Defs. 56.1 Resp. ¶ 80; Allen 56.1 Resp. ¶ 80.)  In support of this
proposition, Sebastian cites to his own affidavit, in which he states that he reviewed the time sheets for March 15, 2007
and arrived at this conclusion.  (Pl. 56.1 Resp., Ex. 75, Sebastian Aff. ¶ 3.)  While Sebastian also includes a copy of the
five electrical inspectors' time sheets as an exhibit to the affidavit, his testimony is based entirely upon hearsay rather
than his own personal knowledge.  Because Sebastian has failed to lay a proper foundation to establish the admissibility
of the documents relied upon, the Court strikes this statement.

[15] The parties do not include any additional details regarding the March 15, 2007 incident in their Local Rule
56.1 submissions.  As such, the Court will limit its analysis with respect to the incident to the facts above.

an event after receiving educational leave for the event.[16]  (Pl. 56.1 Resp. ¶ 56.)

On July 17, 2007, Sebastian attended a disciplinary hearing regarding the March 15, 2007 incident where he relayed his account of the events at issue to Allen, Hall, Loeff, Nugent, and "Marlene Hopkins," whom Sebastian identified as "the new deputy commissioner." (Pl. 56.1 Resp. ¶ 64.)  Approximately three weeks later, Loeff gave Sebastian an oral reprimand regarding the incident, but Sebastian refused to acknowledge receipt.  (*Id.*)  Sebastian has not alleged that he lost pay, has been suspended, or suffered any tangible employment effect from this oral reprimand.  (*Id.*)

In August 2007, when Sebastian, Hall, and Reynolds, requested permission to attend an electrical inspectors convention, Allen e-mailed the request to the acting Commissioner for approval, noting, among other things, that the program was an "excellent training forum."  (Allen 56.1 Resp. ¶ 90; City Defs. 56.1 Resp. ¶ 90.)

That same month, Allen also assigned Sebastian to work District 17 (the Loop area), which, according to Sebastian, was so disorganized that Sebastian spent seven days in the office organizing and updating the paperwork.  (City Defs. 56.1 Resp. ¶ 83; Allen 56.1 Resp. ¶ 83;  Pl. 56.1 Resp., Ex. 63, Sebastian August 27, 2007 Correspondence; Allen 56.1 Resp., Ex. C, Sebastian Dep. 307-08, 321.)

Sebastian believes that he was denied opportunities to work overtime for generator testings

---

[16] In his 56.1(b)(3)(B) Statement of Facts, Sebastian states that after Bush disapproved Sebastian's leave request, "Allen . . . signed the form indicating that he had purportedly approved the request." (City Defs. 56.1 Resp. ¶ 89; Allen 56.1 Resp. ¶ 89.)  In support of his proposition, Sebastian cites to two similar education leave request forms, one purportedly signed by Allen (and not Bush) approving the request and a second purportedly signed by Bush (and not Allen) disapproving the request.  (Pl. 56.1 Resp., Ex. 69.)  The record is unclear, however, as to when Allen signed the former request form.  Allen testified that he probably submitted a request form to Bush and could not think of a reason why Bush would have generated a copy without Allen's signature.  (City Defs. 56.1 Resp., Ex. J, Allen Dep. 332, 334, 336-39.)

on Saturdays in 2007 and that Parks and the union "probably" conspired to deprive him of the overtime. (Pl. 56.1 Resp. ¶ 58.) This belief is founded upon four or five conversations between Department employees regarding Saturday overtime that Sebastian overheard.[17] (*Id.*) In 2007, Sebastian worked generator testing overtime on one occasion, was offered other types of overtime, and turned down certain overtime opportunities. (Pl. 56.1 Resp. ¶¶ 58-59.) Sebastian has never complained to anyone at the City regarding the overtime. (*Id.*)

On three occasions in 2007, Sebastian had difficulty reaching Hall when he phoned in to advise Hall that he was sick. (Pl. 56.1 Resp. ¶ 67.) In all three instances, Sebastian received the sick leave he sought. (*Id.*)

<u>Miscellaneous Alleged Retaliatory Acts</u>[18]

In addition to the events outlined above, Sebastian believes the following occurrences constitute retaliatory acts:

---

[17] Sebastian also submits that he was denied overtime in 2006. Specifically, Sebastian asserts that the only "substantive" overtime work is generator testing and that he was never offered generator testing overtime in 2006. (City Defs. 56.1 Resp. ¶ 77; Allen 56.1 Resp. ¶ 77.) In support of the first proposition, Sebastian cites to a document that seemingly lists emergency generator overtime performed by certain individuals in 2006. (Pl. 56.1 Resp., Ex 58, Overtime Reimbursement.) He fails, however, to establish a proper foundation for the document, provide any explanation regarding the information contained therein, or elaborate on how this document supports his proposition that the only "substantive" overtime was generator testing. In support of the latter proposition, Sebastian cites to a document entitled "Overtime Inspections," but again, fails to lay a proper foundation or provide any explanation in support of his statement. The Court further notes that, while Sebastian initially cites to the document in support of his allegation regarding overtime, he later attacks the reliability of the information contained therein in his sur-response. (Pl. Sur-response Mem. 13-14.) This argument, however, is moot as Sebastian has ultimately failed to cite to any evidence in support of his proposition that he was never offered overtime in 2006. Thus, because these statements are not supported by Sebastian's citations to the record, the Court will not consider these statements. *See* L.R. 56.1.

[18] In his statement of additional facts, Sebastian submits that Sebastian's doctor attempted to call and speak with Sebastian at work, but "was told that he could not speak to Sebastian nor could he leave a message for him." (Allen 56.1 Resp. ¶ 88; City Defs. 56.1 Resp. ¶ 88.) Because this statement relies upon inadmissible hearsay and Sebastian has not laid a proper foundation to establish an exception to hearsay rules, the Court will not consider this statement. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("[A] party may not rely upon inadmissible hearsay . . . to oppose a motion for summary judgment.").

• he believes that, beginning in 2004, he has been followed and chased by unidentified people, but has not identified what connection these people have to Allen or the City. (Pl. 56.1 Resp. ¶ 39.)

• Since October 2004 he has been required to fill out paperwork to request vacation time and to provide medical documentation for sick time, but does not know if other City employees have had to follow the same procedures. (Pl. 56.1 Resp. ¶ 40.)

• On several occasions in 2005, Hall told Sebastian that he did not have any office supplies for Sebastian when Sebastian asked for supplies, including Wite-Out, stationary material, or a pencil. (Pl. 56.1 Resp. ¶ 44.) Sebastian did not speak with anyone else about office supplies or ask anyone else where he might find them. (*Id.*)

• Sebastian unsuccessfully requested business cards from Hall in 2005 and again in 2006; Hall gave EB Department inspector Gibson business cards. (Pl. 56.1 Resp. ¶ 54.) Sebastian is not aware of any other sign inspectors who have received business cards. (*Id.*)

• At an unspecified point in 2005, unidentified supervisors in the Department of Buildings invited other inspectors, but not Sebastian, to a seminar conducted by "Weldy/Lamont Associates, Inc." (Pl. 56.1 Resp. ¶ 47.)

• In mid-2005, Allen completed Sebastian's mid-year review using a 1 to 5 rating system that defined a "3" as "satisfactory performance," a "4" as "excellent performance," and a "5" as "outstanding performance." (Pl. 56.1 Resp. ¶ 43.) Sebastian received four 5s, four 4s, two 3s, and no 2 or 1 ratings.[19] (*Id.*) Subsequently, on Sebastian's 2005 year-end review, Hall gave Sebastian two 5s, four 4s, two 3s, and no 2 or 1 ratings. (*Id.*) Neither evaluation affected his pay or resulted in discipline. (*Id.*)

• On two occasions, one in 2005 and a second in 2006, Hall assigned Sebastian to complete inspections of citizen complaints on the same day that he gave Sebastian the assignment. (Pl. 56.1 Resp. ¶ 57.)

• While Sebastian worked a total of three to four hours of overtime in November 2005 and April 2006, processing for the overtime payments was delayed until October 2006. (Pl. 56.1 Resp. ¶ 53.) Sebastian discussed the matter with Parks and filed a grievance regarding the payment of overtime, but never informed Allen of the payment delays. (*Id.*) Sebastian has yet to receive compensation for forty-three minutes of overtime worked between March 2007 and July 2007, and has worked with his union steward to recover payment. (*Id.*)

---

[19] Sebastian also testified that Allen gave Sebastian a "lower" performance review as part of his 2004 year-end performance evaluation. (Pl. 56.1 Resp. ¶ 42.) However, he failed to produce the review or explain how the 2004 year-end evaluation was lower than his previous evaluations. (Pl. 56.1 Resp. ¶ 42.)

<u>Alleged Witness Retaliation</u>

Sebastian believes that certain witnesses he intended to call to support his claim were retaliated against by the City. Specifically, he claims that Mohammed Sayeed ("Sayeed"), Bernard Simmons ("Simmons"), Donald Gibson ("Gibbons"), and James Hopkins ("Hopkins") experienced retaliation.

As for Sayeed, in October 2007, Sebastian withdrew Sayeed from his list of potential witnesses because Sebastian says he was actively avoiding service. (Allen 56.1 Resp. ¶ 84; City Defs. 56.1 Resp. ¶ 84.) Nothing more is contained in the record.

As for Simmons, at his deposition Simmons testified as to his belief that certain people began to "giv[e] . . . him a hard time" after he met with the City Defendants' attorneys. (Allen 56.1 Resp. ¶ 85; City Defs. 56.1 Resp. ¶ 85; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 183.) Specifically, Simmons claimed that, after the meeting, Hall threatened him with, among other things, physical violence. (Pl. 56.1 Resp., Ex. 5, Simmons Dep. 272-73.) In addition, Simmons claims that Hammersmith told Simmons that he wanted to put Simmons in STF permanently. (Allen 56.1 Resp. ¶ 85; City Defs. 56.1 Resp. ¶ 85; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 271-72.) Subsequently, Simmons explained that he believed Hammersmith was putting him there so he "could save his people from going" to STF. (Allen 56.1 Resp. ¶ 85; City Defs. 56.1 Resp. ¶ 85; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 271-72.) Simmons could not recall whether this alleged conversation with Hammersmith occurred prior to or after his meeting with the City Defendants' attorneys. (Allen 56.1 Resp. ¶ 85; City Defs. 56.1 Resp. ¶ 85; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 271-72.) Both Hammersmith and Hall deny making such comments or threats. (City Defs. 56.1 Resp., Ex. M, Hammersmith Aff. ¶ 14, Ex. P,

Hall Aff. ¶ 11.)

Sebastian also identified Donald Gibson as a potential witness in this action. (Allen 56.1 Resp. ¶ 86; City Defs. 56.1 Resp. ¶ 86.) At his deposition, Gibson testified as to his belief that, after he met with the City Defendants' lawyers, people tried to fire him and that his supervisor, Tom Ryan, harassed him, gave him increased paperwork, and gave him "lame duck" assignments. (Allen 56.1 Resp. ¶ 86; City Defs. 56.1 Resp. ¶ 86; Pl. 56.1 Resp., Ex. 25, Gibson Dep. 271-72.) Gibson was subsequently terminated in 2007. (Allen 56.1 Resp. ¶ 86; City Defs. 56.1 Resp. ¶ 86.) Loeff denies that Gibson was terminated because Sebastian identified him as a witness and submits that he was terminated because of a series of performance issues and insubordination resulting in progressive discipline. (Allen 56.1 Resp. ¶ 86; City Defs. 56.1 Resp. ¶ 86; City Defs. 56.1 Resp., Ex. FF, Loeff Aff. ¶ 8.) Sebastian asserts, however, that a majority of the discipline occurred at some point after Gibson met with the City Defendants' attorneys. (Pl. Sur-Response Mem. 15; Pl. Sur-Response, Ex. 24, Notice of Progressive Discipline; Pl. 56.1 Resp., Ex. 25, Gibson Dep. 160.)

Finally, Sebastian also identified James Hopkins, an electrical inspector for the Aviation Department, as a potential witness. (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87.) On October 31, 2005, the City withdrew a previously extended job offer to Hopkins that would have allowed him to move from the Aviation Department to the EB Department. (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87.) Loeff maintains that he withdrew the offer because he discovered that Hopkins was also working outside the City as an electrical inspector and had falsely certified that he fixed certain violations. (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87; City Defs. 56.1 Resp., Ex. FF, Loeff Aff. ¶ 7.) In his deposition, Loeff testified that he arrived at this conclusion

as a result of his conversations with Allen and Hopkins as well as his review of certain documents. (Pl. Sur-response Mem. 14-15; Pl. Sur-response, Ex. 23, Loeff Dep. 138-65, 180-81, 249-50, 269-74.)  He could not recall the source of his information regarding Hopkins' allegedly false certification.  (Pl. Sur-response, Ex. 23, Loeff Dep. 145-65, 249-50, 269-74.)  According to Hopkins, on September 14, 2007, the City also imposed a twenty-nine day suspension upon Hopkins because Hopkins had unpaid parking tickets and had allegedly failed to execute a Parking Ticket Payment Agreement Plan.  (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87.)  Six days later, the suspension was unexpectedly rescinded.[20]  (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87.)

## *United States v. Sorich*

In 2006, the United States Attorneys Office  prosecuted Robert Sorich ("Sorich") as well as others, for participating in a scheme that provided City jobs and promotions in exchange for campaign work or other favored statuses.  (Allen 56.1 Resp. ¶ 38; City Defs. 56.1 Resp. ¶ 38; Pl. 56.1 Resp., Ex.40, Indictment.)  At the criminal trial, Patricia Molloy ("Molloy"), Mary Jo Falcon ("Falcon"),[21] and Daniel Katalinic ("Katalinic") testified extensively about certain hiring practices they observed during the course of their employment with the City.[22]  (Allen 56.1 Resp. ¶¶ 40-66;

---

[20] In his statement of additional facts, Sebastian further submits that the City rescinded the suspension "[t]hree days after the lawyers in this case appeared at a status hearing and obtained additional time to take discovery on, among other things, Hopkins' suspension."  (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87.)  This proposition is not supported by Sebastian's citation to the record and, therefore, will not be considered by the Court.

[21] Molloy and Falcon asserted their Fifth Amendment right against self-incrimination during their respective depositions in this matter.  (Allen 56.1 Resp. ¶¶ 40, 46; City Defs. 56.1 Resp. ¶¶ 40, 46.)

[22] In his 56.1(b)(3)(B) Statement of Facts, Sebastian devotes twenty-six lengthy paragraphs to the discussion of Molloy, Falcon, and Katalinic's testimony and/or other participation in the Sorich criminal trial.  Because this information is largely irrelevant to the facts of Sebastian's case (as discussed in detail below), the Court has chosen to include a synopsis of the facts contained therein.  It has, however, considered all the supported and admissible facts contained within the twenty-six paragraphs.

City Defs. 56.1 Resp. ¶¶ 40-66.)

Molloy worked as Sorich's secretary at the Mayor's Officer of Intergovernmental Affairs ("IGA") until Sorich left the office. (Allen 56.1 Resp. ¶¶ 40-41; City Defs. 56.1 Resp. ¶¶ 40-41.) At the Sorich criminal trial, Molloy testified that, from 1993 onwards, she compiled a database of information regarding job or promotion requests from coordinators, wards, or unions for over 5,734 individuals (the "Clout List"). (Allen 56.1 Resp. ¶¶ 42-44; City Defs. 56.1 Resp. ¶¶ 42-44.) Molloy would delete names from the database if the individual for whom the job was requested died or moved, or if the political coordinator or other individual who requested the job for the individual no longer wanted the person to obtain the job. (Allen 56.1 Resp. ¶ 43; City Defs. 56.1 Resp. ¶ 43.) Molloy also maintained paper index card files that documented similar information. (Allen 56.1 Resp. ¶ 45; City Defs. 56.1 Resp. ¶ 45.) In 2002, Sorich told Molloy to shred the paper files regarding the job seekers. (Allen 56.1 Resp. ¶ 45; City Defs. 56.1 Resp. ¶ 45; Pl. Ex. 45, Falcon Test. 4111.) When asked at her deposition for the current action as to whether she observed various personnel officers from different city departments meet with Sorich, Molloy asserted her Fifth Amendment right not to testify. (Allen 56.1 Resp. ¶ 45; City Defs. 56.1 Resp. ¶ 45; Pl. 56.1 Resp., Ex. 44, Molloy Dep. 64-65.)

At the Sorich criminal trial, Falcon testified extensively about her experiences manipulating the hiring process while serving as Director of Personnel for the Department of Sewers and Department of Water Management. (Allen 56.1 Resp. ¶¶ 49-59; City Defs. 56.1 Resp. ¶¶ 49-59.) For instance, Falcon explained that, during her transition period into the Department of Sewers position, Falcon's predecessor told her that the mayor's office, not the department commissioner,

was her boss with respect to the hiring process, that Sorich was her point of contact at the IGA and if anyone asked about IGA's involvement in the hiring process, Falcon should always deny the existence of such involvement. (Allen 56.1 Resp. ¶ 52; City Defs. 56.1 Resp. ¶ 52.) Falcon also testified that the IGA became involved in many of the hiring sequences she participated in, that she met with Sorich several times, that she received names of certain individuals from IGA, and that, during some of the meetings, Sorich would refer to note cards or a list with typewritten names (given to Sorich by Molloy) when giving Falcon the names. (Allen 56.1 Resp. ¶¶ 51-56; City Defs. 56.1 Resp. ¶¶ 51-56; Pl. 56.1 Resp., Ex. 39, Falcon Test. 272-73.) Falcon would then manipulate the hiring process (including interviews and ratings) to ensure that the identified people received the open positions. (Allen 56.1 Resp. ¶¶ 56-57; City Defs. 56.1 Resp. ¶¶ 56-57.)

Katalinic, who was a full-time City employee from 1970 through 2003, was the Deputy Commissioner of Street Operations for the Streets & Sanitation Department from 2000 through 2003. (Allen 56.1 Resp. ¶ 61; City Defs. 56.1 Resp. ¶ 61.) From 2000 through 2004, Katalinic was also the head of a political organization that included City employees and assisted in campaign efforts for certain political candidates (the "Katalinic organization"). (Allen 56.1 Resp. ¶ 61; City Defs. 56.1 Resp. ¶ 61; Pl. 56.1 Resp., Ex. 41, Katalinic Revised Plea Agreement; Pl. 56.1 Resp., Ex. 47, Katalinic Test. 2000-01, 2005-08.) During the *Sorich* criminal trial and in his revised plea agreement, Katalinic explained: how he submitted lists to Sorich that contained requests for City jobs and promotions for his political workers; his understanding that the interview process would be manipulated through Sorich and other IGA officials in favor of politically-affiliated candidates; and his knowledge that IGA communicated with the Streets & Sanitation Commissioner's office

about who would be hired, and that the personnel department would then implement those selections.  (Allen 56.1 Resp. ¶¶ 64-66; City Defs. 56.1 Resp. ¶¶ 64-66.)

<u>Hiring Within the Department of Buildings</u>

Allen testified that he does not know and never had any communication regarding the 2004 supervisor interviews with Falcon or with Sorich.  (Pl. 56.1 Resp. ¶ 19.)

At the *Sorich* criminal trial, Kozicki testified that, on one occasion in 2004, he changed his rating form during a hiring sequence to fill seven building inspector positions for the Department of Buildings.  (Allen 56.1 Resp. ¶ 60; City Defs. 56.1 Resp. ¶ 60.)  Specifically, Kozicki testified that, prior to the interviews, Kaderbek made it clear to Kozicki that Kaderbek wanted two individuals - Andrew Ryan ("Ryan") and Kevin Sexton - hired.   (Allen 56.1 Resp. ¶ 60; City Defs. 56.1 Resp. ¶ 60.)  According to Kozicki, Kaderbek advocated for the two individuals, both of whom were the sons of important union officials, because he believed that they would help with union negotiations and to accomplish some other goals they were trying to achieve.  (Allen 56.1 Resp. ¶ 60; City Defs. 56.1 Resp. ¶ 60; Pl. 56.1 Resp., Ex. 75, Kozicki Test. 3070; Pl. 56.1 Resp., Ex. 15, Kozicki Dep. 132-33.)   At some point after the interviews and the rating scores were tallied, Ciaravino told Kozicki that  Ryan's scores did not place him in the top seven candidates and that Kozicki had two choices: change his score and resubmit the paperwork or re-interview the candidates.  (Allen 56.1 Resp. ¶ 60; City Defs. 56.1 Resp. ¶ 60; Pl. 56.1 Resp., Ex. 75, Kozicki Test. 3099; Pl. 56.1 Resp., Ex. 15, Kozicki Dep. 133-34.)  Kozicki chose the former option, changed his scores, and Ryan was ultimately hired.  (Allen 56.1 Resp. ¶ 60; City Defs. 56.1 Resp. ¶ 60; Pl. 56.1 Resp., Ex. 15, Kozicki Dep. 133-34.)

# **STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

# **DISCUSSION**

I.     Evidentiary Issues and Sebastian's Motion to Strike

As a preliminary matter, the Court must address two issues raised by the parties in conjunction with their respective summary judgment submissions.

First, Sebastian has filed a Motion to Strike portions of Allen's and City Defendants' reply pleadings, asserting, among other things, that they impermissibly raised new arguments in their respective reply briefs. Having considered the parties' arguments, the Court grants in part and denies in part Sebastian's Motion to Strike consistent with this Opinion. Specifically, the motion is denied to the extent that Defendants' arguments respond to the arguments raised by or evidence presented by Sebastian in his response to Allen's and the City Defendants' motions for summary judgment. The motion is granted with respect to new matters raised by Defendants that could have been introduced in their opening briefs and cannot be characterized as "responsive." *See TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 630-31 (7th Cir. 2007) ("[A]rguments first made in the reply brief are waived"); *Autotech Techs., Ltd. P'ship v. Automationdirect.com, Inc.*, No. 05 C 5488, 2008 U.S. Dist. LEXIS 23499, at *18-21 (N.D. Ill. Mar. 25, 2008).

Second, Allen and the City Defendants argue that Sebastian's testimony regarding the May 2004 conversation - specifically, Allen's alleged comments regarding Sebastian's national origin and political activity - should be disregarded or stricken because they directly contradict Sebastian's prior statements. Having considered the cited testimony in the context of Sebastian's prior statements, the Court concludes that Sebastian's testimony creates an issue of credibility that is best left to the trier of fact. *See Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638-40 (7th Cir. 2004). With respect to the first statement - regarding national origin alone - City Defendants point out that Sebastian's testimony contradicts his sworn statements to the EEOC, sworn interrogatory answers, and statements in various interviews with and letters to the EEOC, the union, and City officials, certainly making the statements questionable. Such statements, however,

standing alone, do not create the inherent inconsistency that necessitates striking his subsequent deposition testimony. *See id.* (*quoting Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169-70 (7th Cir. 1996)) ("'[A] definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.'").

The second statement - regarding national origin and political activity - presents a closer question for the Court due to its tenuous nature. In his first deposition, Sebastian testified as follows with respect to the May 2004 conversation:

> Q: Did [Allen] say anything then?
> A: He told me right away Tom, you are Indian. You will never get promoted.
> Q: Did you say anything?
> A: No, that is it. That is what he told me.
> Q: That was the end of the conversation?
> A: Yes.

(Pl. 56.1 Resp., Ex. 2, Sebastian Dep. 48.) Subsequently, in his second set of interrogatories, when asked by the City "to state each fact . . . supporting the allegation that [each individual defendant] . . . was personally involved in violating Sebastian's freedom of association," Sebastian made no reference to the alleged May 2004 conversation. (Pl. 56.1 Resp. ¶ 85.) In his fourth deposition, however, when asked if he remembered anything else about the May 2004 conversation, aside from the alleged national origin statements, Sebastian replied, "No. [Allen] said, 'Tom, you are Indian. You're never going to get promoted because you are not politically involved.' Something he mentioned to me." (City Defs. 56.1, Ex. I, Sebastian Dep. 693-94.) Finally, the Court notes that, when asked about the May 2004 conversation in his deposition, Allen testified that Sebastian told Allen he was applying for the promotion and that Patterson told Sebastian that Sebastian would

receive the promotion. (Pl. 56.1 Resp., Ex. 8, 190-94.) Allen also recalled that Sebastian then began to lay what appeared to be cancelled checks on Allen's desk and commented on how he had contributed to political funds. (Pl. 56.1 Resp., Ex. 8, 193-94.)

It is well-established that "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with [statements] that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996). The Court is mindful however, that it must "appl[y] this doctrine with great caution"; "[a] definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Flannery*, 354 F.3d at 638 (internal quotations omitted). In this case, under either party's account of what occurred, the testimony illustrates that there was more to the 2004 conversation than Sebastian initially recalled. If the jury believes Sebastian, they could conclude that Allen commented on Sebastian's national origin, the level of his political activity, or both characteristics. If the jury believes Allen, however, they could conclude that Sebastian, not Allen, commented on his own political contributions before Allen ended the discussion. Thus, while it is true that Sebastian's statements may be said to create the type of contradiction that would warrant this Court striking the subsequent statements, Allen's testimony transforms the issue into one of credibility. Because "[c]redibility and weight are issues of fact for the jury," the Court will not "usurp the jury's role" in making such determinations. *Id.* at 638. For the reasons stated above, the Court will not strike Sebastian's testimony regarding the May 2004 conversation and deems these facts disputed.

II.    <u>Race and National Origin Discrimination Under Title VII (Count 1)</u>[23]

Sebastian maintains that the City discriminated against him on the basis of his national origin (Indian) and race (Asian) by failing to promote him to the supervisor position in 2004 in violation of Title VII.  For the reasons set forth below, City Defendants' Motion for Summary Judgment is denied with respect to Sebastian's national origin and race discrimination claims.

A.    *Discrimination Based on National Origin*

A plaintiff may prove employment discrimination under Title VII if he either: (1) presents sufficient evidence of discriminatory motivation to create a triable issue of fact (the "direct method") or (2) establishes a *prima facie* case of discrimination under the "burden shifting" method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (the "indirect method").  *Sublett v. John Wiley & Sons,* 463 F.3d 731, 736-37 (7th Cir. 2006).

Under the "direct method," a plaintiff may use two different kinds of evidence to demonstrate that the employment was the result of discrimination: (1) "direct evidence" or (2) "circumstantial evidence."  *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006).  Direct evidence of discrimination is evidence which, if believed by the trier of fact, "will prove the particular fact in question without reliance or inference or presumption."  *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999) (*quoting Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997)) (internal quotation omitted). The typical direct evidence situation is an admission by the

---

[23] Allen also moves for summary judgment with respect to Counts I and II, asserting that Sebastian cannot maintain a Title VII claim against Allen because Allen and the other individual defendants are not amenable to suit in their personal capacity under Title VII.  The allegations within Counts I and II of Sebastian's Second Amended Complaint are directed at the City, not the individual defendants.  Nevertheless, the Court notes that, to the extent that Sebastian has attempted to assert discrimination or retaliation claims against Allen, Kaderbek, or Kozicki in their individual capacity, such claims would fail because Title VII does not impose individual liability on supervisory employees. *See Silk v. City of Chicago*, 194 F.3d 788, 797 n.5 (7th Cir. 1999).

decision maker that he acted upon the discriminatory animus. *Phelan*, 463 F.3d at 779 (7th Cir. 2006). Nevertheless, direct evidence "does not require 'a virtual admission of illegality'" or an explicit reference to the plaintiff's protected status. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999).

Sebastian argues that he has presented sufficient evidence under the direct method to establish a question of fact regarding the City's discriminatory intent. Specifically, Sebastian contends that Allen's statement and actions constitute direct evidence of discrimination and that this discriminatory animus may be imputed to the City. Words, actions, and motivations of an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment may be imputed to the decision maker if the employee without formal authority exercises "singular influence" over a decision maker who does have such power. *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612-13 (7th Cir. 2005). Singular influence is defined as "so much influence as to basically be herself the true 'functional[]. . . decision-maker.'" *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 917 (7th Cir. 2007) (*quoting Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004)) (alteration in original). "In some situations, the influence can be exercised by supplying misinformation or failing to provide relevant information to the person making the employment decision." *Id.* Where the decision maker conducts only a perfunctory or "[m]ere paper review" of the non-decision maker's recommendation, that review will not shield the employer from liability if that recommendation was motivated by unlawful bias. *See id.* at 918. The first inquiry, therefore, is whether the evidence indicates discriminatory animus on the part of Allen; and second, if so, whether this alleged animus may be imputed to Kaderbek, who possessed the final decision-

making authority for employment decisions made within the Department.

Sebastian points to Allen's comment regarding Sebastian's national origin during their May 2004 conversation. Generally, derogatory statements based on an employee's national origin can be direct evidence of discriminatory animus if the statement is made by the decision maker (or by a person who influences the decision maker) and the remark was made around the time of and in relation to the employment decision at issue. *See Rozskowiak*, 415 F.3d at 612. The City contends that, because Allen did not explicitly say that he would not hire Sebastian on account of his national origin, Sebastian has failed to establish a sufficient link between Allen's comments and the decision not to promote Sebastian. Yet, a statement need not explicitly refer to an admission of illegal motivation for a reasonable jury to conclude that it is evidence of discriminatory motive. *See Sheehan*, 173 F.3d at 1044. According to Sebastian's account of the May 2004 conversation, Allen's statement was made during a discussion regarding Sebastian's application for the 2004 supervisor position and in response to Sebastian's narration of his qualifications with respect to the position. Further, Allen subsequently served on the interview panel for the supervisor position discussed during the May 2004 meeting and, along with Kozicki, conducted Sebastian's interview for the position. Finally, the Court notes that, to the extent that the discriminatory nature of this statement is ambiguous, "the task of disambiguating ambiguous utterances is for trial, not for summary judgment." *Phelan*, 463 F.3d at 782 (internal quotations omitted). Thus, the Court, drawing all reasonable inferences in favor of Sebastian, concludes that a reasonable jury could find that Allen's alleged May 2004 statement is evidence of discriminatory animus.

This does not, however, end the Court's inquiry, as Sebastian's claim cannot survive unless

a reasonable jury could conclude that the alleged animus may be imputed to the City, and to Kaderbek specifically. The City argues, without legal support or elaboration, that the alleged animus cannot be imputed because both Allen and Kozicki interviewed Sebastian for the position and Sebastian cannot show that Allen's remark influenced Kozicki's or Kaderbek's decisions. Despite such assertions, the Court concludes that Sebastian has put forth sufficient evidence to create a genuine issue of material fact as to whether and to what extent Allen was involved in the decision not to promote Sebastian and whether Allen's alleged animus motivated the employment decision.

In this case, it is undisputed that Allen and Kozicki interviewed eleven of the fifteen candidates for the supervisor position, including the three successful candidates and Sebastian. It is also undisputed that Kaderbek relied upon Allen's, Bush's, and Kozicki's interview notes, recommendations, and ratings when approving the final decision regarding the selected candidates. The record reveals questions of fact, however, as to whether and to what extent Allen: (1) manipulated the interview process in a manner adverse to Sebastian by, for instance, asking Sebastian different technical questions as compared to all of the other candidates or questions that were not included on the Code questions list; (2) influenced Kozicki's evaluation through the alleged manipulations and by telling Kozicki that Sebastian answered technical questions incorrectly when he did not; (3) met with Kozicki and Bush after all of the interviews to discuss all the candidates; and (4) ultimately affected the interview recommendations, notes, and ratings sent to Kaderbek through his alleged acts. The record also reveals a question of fact as to whether Sebastian possessed the requisite degree of "singular influence" over Kaderbek, the ultimate decisionmaker

in this case. *See Brewer*, 479 F.3d at 917. While it is undisputed that Kaderbek reviewed and relied on the interviewers' recommendations, the record is unclear as to the events surrounding Ciaravino's drafting of the notification letters. Thus, while evidence indicates that Allen, Kozicki, Bush, and Kaderbek were all involved, at least peripherally, in the process that resulted in the decision not to promote Sebastian, there remains a question of fact as to the degree of Allen's influence and the adequacy of Kaderbek's independant investigations before the employment decision was made. *Compare Brewer*, 479 F.3d at 920 (independent investigation conducted where decision maker examined a parking tag that plaintiff improperly modified to confirm that it had been altered).

Thus, the Court concludes that Sebastian has presented sufficient evidence to survive summary judgment with respect to his claim of discrimination on account of national origin.

B.    *Discrimination Based on Race*

Sebastian also submits that the City denied Sebastian the promotion on account of his race. In support of this claim, Sebastian attempts to proceed under both the indirect and direct methods. Because it is dispositive, the Court will first address Sebastian's application of the burden-shifting, indirect method of proof. To establish a *prima facie* case for failure to promote under the "indirect method," the plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position sought; (3) he was denied the promotion; and (4) the promoted employee was not a member of the protected class and was not better qualified than the plaintiff. *Sublett*, 463 F.3d at 737. If the plaintiff establishes the *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action against the plaintiff. *Id.* Once such a reason is given, the burden then returns to the plaintiff to show that the employer's

explanation was pretextual. *Id.* In this case, the City argues that summary judgment is appropriate because Sebastian cannot establish the fourth element of the *prima facie* case or that the City's proffered reasons for the denial of the promotion are pretextual.

With respect to the fourth element of the *prima facie* case - that the promoted employees were not better qualified - the City maintains that Sebastian cannot show that Hall, Hammersmith, and Reynolds were less qualified as compared to Sebastian because Sebastian performed poorly during his interview.[24] In support of this proposition, the City points to the ratings of Sebastian, Hall, Hammersmith, and Reynolds. In addition, the City submits the testimony and affidavit of Kozicki and Allen in which they state that Sebastian answered interview questions poorly, that Sebastian did not respond fully to questions or provide concrete examples when specifically asked to do so, and that the successful candidates performed better as compared to Sebastian.

Generally, an employer may rely on subjective criteria, including a candidate's interview performance, when determining whether a candidate is qualified for the position at issue. *See Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005). This Court has found several disputes of material fact concerning events occurring during and after Sebastian's interview that create a genuine issue of fact as to whether Allen's and Kozicki's ratings for Sebastian and subsequent explanations regarding Sebastian's interview are accurate. *See* § IV(B); *see also* § II(A). Thus, similar to the reasons that justify denying summary judgment with respect to the national origin claim against the

---

[24] In support of its Motion for Summary Judgment, the City also submits that: (1) Kozicki's and Allen's accounts of the interview are corroborated by their interview notes; (2) Sebastian admitted to an EEOC investigator that he gave short answers during his interview; and (3) unlike Sebastian, each of the successful candidates had supervisory experience in the private sector. The Court will not consider these arguments, as they are based on extrinsic evidence. *See, e.g., Divane v. Sonak Elec. Contractors, Inc.*, No. 05 C 1211, 2008 U.S. Dist. LEXIS 1901, at *2 (N.D. Ill. Jan. 9, 2008).

City and the political retaliation claim against Allen, there exists a genuine issue of fact regarding Sebastian's performance during his interview for the 2004 promotion and whether Sebastian was more qualified that Hammersmith, Hall, and Reynolds.

Sebastian has also create a genuine issue of material fact as to whether the City's proffered reason for the failure to promote is pretextual. "Pretext is a 'lie, specifically a phony reason for some action.'" *Sublett*, 463 F.3d at 737. "The issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *Wade v. Lerner N.Y., Inc.*, 243 F.3d 319, 323 (7th Cir. 2001). In this present case, the City maintains that Sebastian did not receive the promotion because Allen and Kozicki wanted to promote individuals who were knowledgeable about the Code, had ideas for the Department, could motivate and manage the employees, could communicate well, and could handle the stress of the job. Consequently, they did not promote Sebastian because he performed poorly during his interview and did not receive the highest scores. This argument essentially mirrors the City's argument regarding the fourth element of the *prima facie* case. As noted above, "[the Seventh Circuit] has . . . never held that a job interview must be scored according to some sort of objective criteria." *Blise*, 409 F.3d at 868. However, "the jury may, under some circumstances, reasonably consider subjective reasons as pretexts." *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427-28 (7th Cir. 1992); *see also Healy v. City of Chicago*, 450 F.3d 732, 744 n.16 (7th Cir. 2006) ("[A] departure from [a standard list of questions] is suspicious."). In this case, the record presents several factual disputes with respect to the actions that surrounded Sebastian's interview. These factual disputes create a question of fact as to whether Allen and

Kozicki honestly believed the reasons proffered. For instance, questions of material fact remain as to: (1) whether Allen asked Sebastian all eight Code questions, different technical questions as compared to all other candidates, and questions that were not included on the Code questions list; (2) whether Allen told Kozicki that Sebastian answered technical questions incorrectly when he did not; (3) whether Allen met with Kozicki and Bush after all of the interviews to discuss all the candidates; and (4) the circumstances surrounding Ciaravino's drafting of the notification letters.

In sum, the Court finds that there are genuine factual disputes as to whether Hall, Hammersmith, and Reynolds were better qualified as compared to Sebastian and whether the City's reasons for not promoting Sebastian are pretextual. Accordingly, the Court denies the City's Motion for Summary Judgment with respect to Sebastian's race discrimination claim.[25]

### III.    Retaliation Under Title VII (Count II)

To overcome the City's motion for summary judgment and establish a *prima facie* case of retaliation under Title VII, Sebastian may proceed under either the direct or indirect method of proof. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (*citing Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002)). Here, Sebastian attempts to proceed under both.

Under the direct method, the plaintiff must establish that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action subsequent to this protected activity; and (3)

---

[25] Sebastian submits multiple theories in support of his national origin and race discrimination claims. Having concluded that Sebastian has created a triable issue as to the national origin and race discrimination claims under the direct and indirect methods, respectively, the Court need not address the merits of Sebastian's additional arguments.

a causal connection between the two. *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (*citing Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)). In the absence of direct evidence, a plaintiff can succeed under the direct method by presenting sufficient circumstantial evidence such that a jury could infer retaliation. *Id.* Circumstantial evidence can include suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext, and other evidence which allows the jury to reasonably infer retaliation. *See Hemsworth v. Quotesmith.com, Inc.,* 476 F.3d 487, 491 (7th Cir. 2007) (*citing Yong-Qian Sun v. Bd. of Trs.,* 473 F.3d 799, 812 (7th Cir. 2007)).

To succeed under the indirect method of proof, the plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) he performed his job according to his employer's legitimate expectations; (3) despite his satisfactory job performance, he suffered an adverse action from the employer; and (4) he was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *Sitar*, 344 F.3d at 728 (*citing Stone v. City of Indianapolis Pub. Utils. Div*., 281 F.3d 640 (7th Cir. 2002)). The failure to satisfy one element of this prima facie case is "fatal" to the retaliation claim. *Sublett*, 463 F.3d at 740 (*citing Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004)). If the plaintiff establishes these four elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action. *Sitar*, 344 F.3d at 728 (*citing Stone v. City of Indianapolis Pub. Utils. Div*., 281 F.3d 640 (7th Cir. 2002)). If the defendant does so, the burden then shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.* While the burden of production shifts between the parties under this method, "'the burden of persuasion rests at all times on the

plaintiff.'" *Id.* (*quoting Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003)).

To be similarly situated, another employee must be "'directly comparable in all material respects.'" *Sublett,* 463 F.3d at 740 (*quoting Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004)). Plaintiff must show that he or she is similarly situated with respect to performance, qualifications, and conduct. *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005). This normally includes a showing that the employee "'dealt with the same supervisor, was subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Gates v. Caterpillar*, 513 F.3d 680, 690 (7th Cir. 2008). Ultimately, the employee must show *substantial similarity*, rather than complete identity, when comparing himself to the favorably treated employee. *Humphries v. CBOCS West, Inc.*, 474 F.3d 397, 405 (7th Cir. 2007).

Neither party disputes that Sebastian engaged in protected activities: Sebastian exercised his First Amendment right to file a charge with the EEOC, which he did on September 17, 2004, and initiated the instant action on April 18, 2005. The parties disagree as to whether the fifteen sets of action identified by Sebastian in conjunction with his retaliation claim constitute materially adverse actions and, if they do, whether Sebastian can create a triable issue under one of the two methods of proof articulated above. For the sake of clarity, the Court will address each of Sebastian's claimed adverse actions individually. *See Oest v. Ill. Dept. of Corrections*, 240 F.3d 605, 612-15 (7th Cir. 2001) (evaluating each alleged adverse action to test the viability of plaintiff's indirect method retaliation claim).

A materially adverse action is one that "well might have 'dissuaded a reasonable worker

from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (*quoting Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). "Context matters" for the purposes of the materially adverse action analysis. *Id.* at 69. Thus, "an act that would be immaterial in some situations is material in others." *Id.* (internal quotations omitted). In all cases, "normally petty slights, minor annoyances, and simple lack of good manners" are insufficient to dissuade an employee from reporting discrimination and are, therefore, not materially adverse. *Id.* at 68.

Sebastian points to numerous alleged examples of retaliatory conduct: (1) Hammersmith's and Hall's instructions to Sebastian to leave the office to do field work; (2) Hall's refusal of Sebastian's request to change an office day in November 2006; (3) Tom Ryan shouting at Sebastian on February 15, 2007; (4) Sebastian's difficulty reaching Hall on three occasions in 2007 when he was sick; (5) the City's requirement that Sebastian fill out paperwork to request vacation time and provide medical documentation for sick time; (6) Hall's one day assignments in 2005 and 2006 instructing Sebastian to complete inspections of citizen complaints; (7) Sebastian's negative[26] performance reviews; (8) unidentified people following Sebastian; (9) Hall's denial of office supplies to Sebastian on several occasions in 2005 and denial of business cards to Sebastian in 2005 and 2006; (10) Sebastian's assignments in different districts; (11) Bush's denial of Sebastian's request for educational leave; (12) Allen's assignment of Sebastian to the July 2005 skeleton crew; (13) the City's "denial" of overtime; (14) the various Department employees' four attempts to

---

[26] While not essential to its holding, the Court also notes that Sebastian has failed to proffer any evidence to support the proposition that any of his performance evaluations were "negative."

"discipline" Sebastian; and (15) Allen's assignment of STF shifts to Sebastian.[27]

As a preliminary matter, the Court notes that several of the actions, specifically, the first seven, cannot succeed because they either fall into the category of minor slights and annoyances or simply because there is no support in the record for them. *See Burlington Northern*, 548 U.S. at 68 ("petty slights or minor annoyances that often take place at work and that all employees experience"); *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (increased work assignments that do not require the plaintiff to work extra hours or result in discipline or a loss of pay are not actionable, nor are lower performance ratings unaccompanied by tangible job consequences); *Roney v. Ill. Dept. of Trans.*, 474 F.3d 455, 461 (7th Cir. 2007) (it is unlikely that a reasonable employee would view a routine assignment as materially adverse); *Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir.1997) (no materially adverse employment action where plaintiff's boss "yelled at her and did not make her feel as if she was part of the work group"). Sebastian's allegation that he is being "followed" also fails, as it is wholly unsupported and based upon speculation. *See Allen v. Am. Signature, Inc.*, No. 07-3698, 2008 U.S. App. LEXIS 7714, at *8 (7th Cir. March 31, 2008). Nor can Sebastian's assertion regarding the denial of certain office supplies and business cards sustain a claim for retaliation under the direct or indirect method because neither can constitute an action so adverse that it would have prevented a reasonable person from making or supporting a

---

[27] Sebastian also submits that his doctor's inability to speak with or leave a message for Sebastian when he called on two occasions constitutes a materially adverse action. As discussed above, Sebastian fails to present any admissible evidence in support of this proposition. Even if the Court were to consider the argument, however, the facts presented would not create a triable issue as to whether the doctor's inability to speak with or leave a message for Sebastian constitutes a materially adverse action. There is no evidence as to who answered the phone when the doctor called and whether the person knew of Sebastian's protected activity. Similarly, Sebastian has proffered no evidence to indicate whether he was in the field and unavailable and whether it was routine to prohibit third parties from leaving messages. Absent such evidence (or any combination thereof), a reasonable jury could not infer that the action was materially adverse. *See Burlington Northern*, 548 U.S. at 68-69.

charge of discrimination.  Sebastian has proffered no evidence to suggest that it was routine for an electrical inspector like Sebastian to obtain his office supplies from Hall, that Hall was Sebastian's only source of supplies, that Sebastian did not obtain the supplies from another source, or that his inability to obtain the requested supplies (such as Wite-Out or stationary material) significantly altered the terms or conditions of his employment.  *See Burlington Northern*, 548 U.S. at 68.

The Court can also quickly dispose of Sebastian's complaints regarding his coverage of a different district in either 2006 or 2007 and assignment to District 17 in 2007.  Sebastian has not produced evidence from which one could infer that the assignments significantly altered his job responsibilities, caused him to work extra hours, resulted in a loss of pay or discipline, or changed the terms and conditions of his employment in any material way.  *See Lapka*, 517 F.3d at 986 (more difficult and time-consuming assignments are not actionable where they do not significantly alter job responsibilities).

Sebastian also submits that the denial of his April 2007 request for a two-day educational leave is materially adverse for Title VII purposes.  While the denial of an educational opportunity that would significantly contribute to an employee's professional advancement may, in some instances, fall into the category of materially adverse action, s*ee Burlington Northern,* 548 U.S. at 69, Sebastian fails to provide any details from which one could reasonably infer that the two-day seminar presented such an opportunity.  Even if the Court were to assume that the denied leave was actionable, Sebastian has not met his burden on summary judgment with respect to the remaining elements of the *prima facie* case.  Sebastian contends that the ambiguity surrounding when Allen signed and approved Sebastian's request for leave creates "suspicious" circumstances  that would

allow a jury to conclude that Allen was attempting to "mask his retaliatory conduct." However, such a conclusion would "cross the line between reasonable inference and unsupported speculation." *Davenport v. Northrop Grumman Sys. Corp.*, No. 07-3362, 2008 U.S. App. LEXIS 12625, at *6 (7th Cir. June 12, 2008). In this case, it is undisputed that Bush, rather than Allen, ultimately denied Sebastian's request. The Court further notes that subsequently, in August 2007, Allen emailed the acting Commissioner and requested approval for additional educational leave on behalf of Sebastian, as well as Hall and Reynolds. In light of such facts, a reasonable person could not conclude that the April 2007 denial of educational leave was retaliatory.

As for his assignment to the July 2005 skeleton crew assignment, even if the Court were to assume Sebastian's account of the events leading up to the assignment and adopt the dubious notion that this one and one-half hour assignment is sufficiently adverse to dissuade a reasonable employee from making or supporting a charge of discrimination, Sebastian has not presented any evidence to support a *prima facie* case under the burden-shifting method. In support of his position, Sebastian contends that no similarly situated individual worked on a skeleton crew. Sebastian does not, however, identify, much less present, admissible evidence of any similarly situated individual outside the protected class who is directly comparable to the plaintiff "in all material respects." Absent such a showing, Sebastian's generalized assertions cannot support a retaliation claim. *See, e.g., Sublett,* 463 F.3d at 740 ("It. . . [is] up to . . . [plaintiff] to find others who . . . [are] 'directly comparable in all material respects'") (*citing Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)); *Oest*, 240 F.3d at 615 ("conclusory assertion[s]" that plaintiff was treated differently, without specific evidence, will not satisfy the similarly situated requirement).

Nor does the thirteenth claimed action - that Sebastian was denied overtime in 2007 - stave off dismissal of Count II.[28]  In support of his theory, Sebastian submits only his *belief* that he was denied overtime for generator testing in 2007.  According to Sebastian, this belief is founded upon the fact that he overheard four or five conversations between Department employees regarding overtime.  Sebastian provides no other admissible evidence regarding the nature of those conversations, whether the individuals were similarly situated "in all material respects," or even the identity of the decision maker with respect to the delegation of overtime.  To the contrary, Sebastian admitted that he was unaware of any role that Allen would have played in determining who received overtime in 2007 and that he believed that the union steward and union were "probably conspiring" against him.  Such beliefs do not create a genuine issue of fact as to retaliation.  *See Payne v. Milwaukee County*, 146 F.3d 430, 434 (7th Cir. 1998) (subjective belief insufficient for *prima facie* case of retaliation).

Next Sebastian claims he was subjected to four instances of "unsubstantiated" discipline subsequent to the filing of his EEOC charge.  While Sebastian does not identify the four instances in his response brief or elaborate further on this theory, the Court assumes that Sebastian is referring

---

[28] The Court notes that, although he waited until his sur-response, Sebastian did present an argument regarding the alleged denial of overtime in 2006.  However, because Sebastian fails to present evidence in support of this assertion, the Court need not consider whether an actual denial of overtime would constitute a retaliatory action in the circumstances presented.  Additionally, because Sebastian fails to present any argument regarding the delayed processing of or withhold of certain overtime payments, the Court deems this argument waived.  *See Culver v. Gorman & Co.*, 416 F.3d 540, 550 (7th Cir. 2005) (*quoting United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005)) ("'unsupported and undeveloped arguments are waived'"); *see also Graham v. AT&T Mobility, LLC*, Nos. 06-3020, 06-3734, 2007 U.S. App. LEXIS 21598, at *12 (7th Cir. Sept. 6, 2007) ("[T]his court is not obligated to research and construct legal arguments open to parties, especially when they are represented by counsel.'") (*quoting John v. Barron*, 897 F.2d 1387, 1393 (7th Cir. 1990)).

to the following incidents: (1) the informal meeting in late 2005 or early 2005 regarding sick time; (2) the June 2005 predisciplinary hearing regarding Sebastian's failure to report to work; (3) the February 22, 2007 verbal counseling regarding a delayed response to Hall's calls; and (4) the July 11, 2007 disciplinary hearing and July 27, 2007 written oral reprimand regarding the March 15, 2007 incident.

As a preliminary matter, the Court notes that Sebastian has failed to present any legal authority or argument in support of his retaliation claim with respect to the first, second, and fourth incidents listed above. Thus, the Court deems these arguments waived. *See Culver v. Gorman & Co.*, 416 F.3d 540, 550 (7th Cir. 2005). Regardless, although Sebastian characterizes the three actions as "factually unsubstantiated efforts to discipline," he does not dispute that he committed the actions that resulted in "discipline" or present any evidence from which one could infer that the "discipline" was anything other than routine. *See Campbell v. Potter,* 57 Fed. Appx. 267 (7th Cir. 2003). Nor can Sebastian rely on temporal proximity alone, as the first event occurred approximately nine months after Sebastian filed the EEOC charge and two months after initiating the current action. *See Kodl v. Bd. of Educ.*, 490 F.3d 558, 563 (7th Cir. 2007) (*quoting Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)) ("'Suspicious timing alone is rarely sufficient to create a triable issue'" as to the requisite causal connection); *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001) (one-month gap between EEOC charge and termination insufficient); *EEOC v. Yellow Freight Sys.*, 253 F.3d 943, 952-53 (7th Cir. 2001) (en banc) (six-week gap between EEOC charge and termination insufficient). He has once again failed to put forth any specific testimony regarding the identity of any similarly situated individual who previously committed the

same act, but avoided similar "discipline." Absent this showing, Sebastian's generalized assertions cannot support a retaliation claim. *See, e.g., Sublett,* 463 F.3d at 740.

Regarding the third instance of "discipline" - the February 22, 2007 informal meeting and verbal counseling - Sebastian has also failed to create a genuine issue of material fact as to retaliation for two reasons. First, the verbal counseling and informal meeting do not rise to the level of a materially adverse action. Sebastian has presented no evidence of unsubstantiated progressive discipline, procedurally irregular warnings, or of lost compensation, assignments, or employment opportunities as a result. Further, there is no evidence from which one can infer that the verbal counseling caused any future adverse action. Given this dearth of evidence, a reasonable trier of fact could not conclude that the verbal counseling and informal meeting constituted an adverse employment action. *Compare Allen*, 2008 U.S. App. LEXIS 7714, at *8 (written reprimand is not a materially adverse action); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 ( 7th Cir. 2005) (same); *Luera v. Heart Ctr. Med. Group*, 07 C 101, 2008 U.S. Dist. LEXIS 10191, at *21-22 (N.D. Ill. Feb. 8, 2008) (verbal counseling and write-ups are not actionable), *with Pantoja*, 495 F.3d at 849 (disciplinary warnings may constitute adverse employment actions). Second, Sebastian, once again, does not identify a single similarly situated individual outside of the protected class who was treated more favorably. *See Sublett,* 463 F.3d at 740. Instead, he relies primarily on the direct method of proof and submits the following two pieces of evidence: (1) Allen, rather than Hall, issued the counseling and (2) Allen did not ask Hall to substantiate the timing or obtain the phone records

himself.[29]  A reasonable jury could not conclude that the verbal counseling was retaliatory based on the mere fact that Allen, rather than Hall, issued the counseling, as such an inference would be based on speculation rather than facts.  *See Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 931-32 (7th Cir. 1995) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue.").  Nor has Sebastian proffered any admissible evidence in his Local Rule 56.1 submissions to support the proposition that Allen did not ask Hall to substantiate the timing of Sebastian's response to Hall's phone calls.[30]  Thus, the February 22, 2007 incident does not create a triable issue as to retaliation.

Regarding Sebastian's fifteenth claimed retaliatory act - STF assignments - Sebastian contends he has created a triable issue under the direct method of proof.[31]  In support of its position

---

[29]  The Court notes that Sebastian makes no mention of the minor variation between Hall's and Allen's statements regarding Sebastian's response time on February 5, 2007.  Accordingly, the Court deems this argument waived.  *See Culver*, 416 F.3d at 550 (7th Cir. 2005).

[30]  In his sur-response, Sebastian further submits that the Defendants' failure to produce the phone records to substantiate the factual basis for Sebastian's discipline entitles Sebastian to an adverse evidentiary inference regarding the true contents of those records.  This argument is unavailing for two reasons.  First, as discussed above, the Court previously struck the extrinsic evidence that supports this argument.  Consistent with that decision, the Court also struck any argument founded upon the extrinsic evidence.  Second, even if the Court were to consider this argument, Sebastian would not be entitled to the adverse evidentiary inference at this juncture.  The "destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse" to the City.  *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002).  Instead, the City must have destroyed the evidence in bad faith.  *Id.*  The "bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction." *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001).  Similarly, the violation of a record retention policy "creates a presumption that the missing record[s] contained evidence adverse to the violator." *Park*, 297 F.3d at 615 (citation omitted).  Here, Sebastian's counsel stated during Loeff's deposition that he never received the records.  (Pl. Sur-response, Ex. 23, Loeff Dep. 66.)  Sebastian has not, however, come forward with any evidence or argument indicating bad faith on behalf of Defendants or even that Sebastian ever requested the phone records during discovery.  Thus, Sebastian is not entitled to an adverse inference.

[31]  Sebastian also maintains that he has met his burden under the indirect method.  In support of this theory, Sebastian submits that Allen assigned Sebastian to STF more than any other candidate for the 2004 supervisor position.  This argument is based entirely upon inadmissible evidence. (City Defs. 56.1 Resp. ¶ 76; Allen 56.1 Resp. ¶ 76.)  Even if the Court were to consider the statement, Sebastian's argument would be futile because Sebastian has failed to identify a sufficient set of comparators for the similarly situated inquiry.  To be similarly situated, the employees must be

to the contrary, the City maintains that the STF assignments were not adverse employment actions and that Sebastian cannot establish a *prima facie* case of retaliation. Because it is dispositive, the Court will address the City's latter argument first. Under the direct method, Sebastian proffers two admissible pieces of evidence in support of his claim. First, Sebastian argues that Allen assigned him to STF approximately nine days after Loeff "circulated" the charge to "Kozicki and others." (Pl. Resp. 13.) Fatal to this argument, however, is that Loeff did not "circulate[]" the charge to "Kozicki and others." Instead, the record reveals that Loeff emailed the charge to Kozicki and copied Kaderbek. Thus, Sebastian cannot rely solely on the nine day lapse between Loeff's email and the STF assignment to create a triable issue. Nor has Sebastian proffered other evidence (or argument) from which one could infer that Allen knew Sebastian filed the EEOC charge prior to Sebastian's assignment to STF. A decision maker cannot retaliate against the employee if she is unaware of the complaints asserted against her. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000). Thus, without such knowledge, Allen's decision to place Sebastian on STF could not have been retaliatory. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("It is not sufficient that an employer could or even should have known about an employee's complaint; the employer must have had actual knowledge of the complaints for its decisions to be retaliatory") (internal quotations and alterations omitted); *see also Davenport*, 2008 U.S. App. LEXIS 12625, at *6; *Huppert v. Potter*, 232 Fed. Appx. 576, 581 (7th Cir. 2007) (summary judgment denied where the plaintiff provided no evidence that decision makers were aware of the

---

"'directly comparable in all material respects.'" *Sublett,* 463 F.3d at 740. A reasonable trier of fact could not conclude that Sebastian was "directly comparable in all material respects" to other electrical inspectors on the days that Allen assigned Sebastian to STF by the mere fact that, at one time, Sebastian applied for the same promotion as other electrical inspectors. *See, e.g., id.; Oest*, 240 F.3d at 615.

plaintiff's EEO complaint). Second, Sebastian asserts that Allen's distribution of a memorandum indicating that inspectors would rotate through STF assignments a mere two weeks after Sebastian obtained leave from the Court to file a retaliation claim is evidence that Allen previously retaliated against Sebastian through STF assignments. This argument is also unavailing as it is undisputed that, prior to the announcement, Allen rotated sign inspectors on the STF assignment.

Because there is no genuine issue of material fact associated with Sebastian's retaliation claim, City Defendants' motion for summary judgment as to Count II is granted.[32]

IV.     Failure to Promote under § 1983 Claim (Count III)

To establish a First Amendment retaliation claim, a plaintiff must establish: (1) that he engaged in a constitutionally protected activity and (2) that the protected conduct was a "substantial or motivating factor" in defendants' challenged action. *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004). If the plaintiff makes this *prima facie* showing, the burden shifts to the defendants to demonstrate that the same action would have been taken in the absence of the protected activity. *Healy*, 450 F.3d at 739. If the defendants carry this burden, the plaintiff "'bears the burden of persuasion to show that [the defendants'] proffered reasons were pretextual and that discrimination was the real reason for the [employment action].'" *Id.* (*quoting Smith v . Dunn*, 368 F.3d 705, 708 (7th Cir. 2004)) (alteration in original).

Allen and the City Defendants do not challenge Sebastian's ability to establish the first

---

[32] It is unclear from Sebastian's submissions as to whether he also posits that these actions, in the aggregate, constitute an adverse action. Nevertheless, to the extent that Sebastian would submit such a theory, it would not stave off dismissal of Count II. Considering the actions as a whole does not cure Sebastian's failure to submit evidence establishing the *prima facie* case under the direct or indirect method. *See, e.g., Campbell v. Potter*, 57 Fed. Appx. 267, 268 (7th Cir. 2003). Nor does Sebastian's argument that the alleged retaliation is "corroborated" by the alleged witness harassment stave off dismissal of his claim. Such reliance on speculation, rather than facts, will not preclude summary judgment. *See Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 931-32 (7th Cir. 1995).

element of the *prima facie* case - that Sebastian engaged in a constitutionally protected activity. Instead, their challenge focuses on whether protected conduct was a "substantial or motivating factor" in their failure to promote Sebastian and whether Sebastian would have been denied the promotion in the absence of this protected activity. The burden in this regard is "not insignificant." *Nelms v. Modisett*, 153 F.3d 815, 818 (7th Cir. 1998) (*quoting Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981)) ("A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election."). In other words, *"*[i]t is not enough to show only that the plaintiff was of a different political persuasion than the decisionmakers." *Hall*, 389 F.3d at 762. Instead, the plaintiff must present specific evidence that the defendants knew of his political affiliation and took action against him because of the political affiliation. *Id.* at 762-63. In doing so, the plaintiff cannot rely on speculation or opinions of non-decision makers as proof that the defendants acted because of political affiliation. *Nelms*, 153 F.3d at 891. Nor can he rely on "self-serving declarations based on nothing more than his own speculation." *Healy v. City of Chicago*, No. 00 C 6030, 2004 U.S. Dist. LEXIS 13553, at *17-18 (N.D. Ill. July 20, 2004) (*citing Kelly v. Mun. Ct. of Marion County, Ind.*, 97 F.3d 902, 911 (7th Cir. 1996)). Additionally, to hold an individual liable, the plaintiff must establish that the individual "caused or participated in an alleged constitutional deprivation." *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986).

In this case, Sebastian asserts First Amendment retaliation claims against Kaderbek, Kozicki, Allen, and the City. Specifically, he claims he was denied the supervisor promotion based on his political affiliation and the exercise of his right to support political officials by, among other things,

refusing to contribute to the political campaigns of Chicago aldermen in 2003 and 2004. (Second Am. Compl. Count III, ¶¶ 1-37; Pl. Summ. Jmt. Resp. 17-33.)

A.    *Defendants Kozicki and Kaderbek*

The "threshold question" in analyzing whether an employment decision was motivated by the plaintiff's political activities "is whether the defendants even knew about" those activities. *Hall*, 389 F.3d at 762. A decision maker cannot retaliate on account of the protected activity if he is unaware of the protected activity. *See Healy*, 450 F.3d at 740-41 (*citing Miller v. Amer. Family Mut. Ins. Co.*, 389 F.3d 708, 715 (7th Cir. 2004)). Because Sebastian has failed to present evidence from which a trier of fact could reasonably infer awareness on the part of Kaderbek or Kozicki, the Court's analysis with respect to the two individuals begins and ends with this inquiry.

Sebastian invites this Court to examine several pieces of evidence that he believes establish a triable issue as to knowledge: (1) testimony from the *Sorich* trial, including Kozicki's admission that he manipulated the selection process at a prior date and time with another applicant for a different position; (2) the alleged "highly politically active" nature of the successful candidates; (3) Defendants' actual awareness of Sebastian's contributions to Alderman Allen's campaigns; and (4) Ciaravino's, Falcon's, and Molloy's invocation of their respective Fifth Amendment rights against self incrimination.

With respect to the *Sorich* trial - Sebastian maintains that an inference can be drawn from the repeated use of "unlawful political sponsorship" to make employment decisions, including the use of the "Clout List" and the similar hallmarks between the selection process in this case and the employment practices at issue in the *Sorich* trial. Yet, Sebastian has failed to connect the testimony

of Molloy, Falcon, and Katalinic to the facts in this case or to a widespread practice within the Department of hiring electrical inspectors based on political affiliation. Nor does Kozicki's admission that he changed his interview scores during a 2004 building inspector hiring sequence create a triable issue as to awareness. According to Kozicki, Kaderbek did not advocate for Ryan's, as well as another candidate's, hiring because of political affiliation. Instead, he did so because the two individuals were the sons of important union officials and Kaderbek believed they would help with union negotiations. Such evidence does not create a genuine issue of fact as to whether Kaderbek and Kozicki were aware of Sebastian's political association during a separate and independent hiring process for a different position with different candidates.

Sebastian also asserts that knowledge could be inferred because "the successful candidates were each highly politically active." (Pl. Resp. Mem. 27.) The Seventh Circuit has "sometimes assumed that a person's holding of an arguably prominent party office could support a finding of common knowledge among decisionmakers, and sometimes . . . [it has] not." *Hall*, 389 F.3d at 763 (comparing cases). For instance, in *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992), the plaintiff's public activities, specifically, his membership in the Young Democrats, campaigning on behalf of (and publicly endorsing) the mayor, and his precinct captainship for the democratic party in his district, were sufficient to raise an inference that the decision makers were aware of his political affiliation. In contrast, the court in *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992), found it unreasonable to infer knowledge because the plaintiff failed to "provide any facts to support the conclusory statement that her political affiliation was well known -- she [did] not say how her political affiliation became so well known or who knew her political affiliation."

Much like the plaintiff in *Cusson-Cobb*, Sebastian has failed to support his conclusory assertion that Hall, Reynolds, and Hammersmith were so "highly politically active" prior to the 2004 supervisor promotions that a reasonable trier of fact could infer that Kozicki and Kaderbek had knowledge of their political activity. For instance, Sebastian maintains that Hall's prominence stems from the fact that he is "a religious leader at a powerful south side Chicago Church . . . where elected officials and Local 134 union members have attended service" and that he "has volunteered . . . to do political work on behalf of political candidates and officials." (City Defs. 56.1 Resp. ¶ 35.) Putting to one side Sebastian's self-serving description of Hall's work, the remaining evidence reveals that Hall is an ordained minister at a Chicago church, that there have been a few occasions when an elected official has been in attendance at the church, that approximately ten or fewer non-City Local 134 electricians attend the church, and that, in the mid-90's, Hall volunteered to do some political work for a candidate named "Lightfoot." Sebastian presents no evidence from which one could infer that the church was "powerful," that an elected official has attended the church with any regularity, or that Hall has done political work in the past decade.[33]

Similarly, while Sebastian submits that Reynolds grew up in the same neighborhood as State Representative Kevin Joyce and has known Kevin Joyce since the 1970's, this mere affiliation, without more, does not create a triable issue as to whether Reynolds was politically active or

---

[33] Perhaps recognizing the disparity between Sebastian's characterization of Hall's political activity and the facts revealed by the record, Sebastian contends that the credibility of Hall's statements must be assessed in the context of additional evidence proffered by Sebastian. However, Sebastian bears the ultimate burden of proof and cannot meet this burden "'by relying on the hope that the jury will not trust the credibility of . . . [the] witnesses.'" *Cichon v. Exelon Generation Co., LLC,* 401 F.3d 803, 815 (7th Cir. 2005) (*quoting Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991)).

whether Kozicki and Kaderbek were aware of Reynolds' political affiliation. *See, e.g., Boehl v. DeLuca,* No. 04 C 5606, 2007 U.S. Dist. LEXIS 11670, at *33-42 (N.D. Ill. Feb. 16, 2007) (no evidence to support inference of awareness). Nor does the fact that Reynolds began his political activity in 2002, without any details regarding the nature or frequency of the activity, create such an inference. *See Cusson-Cobb*, 953 F.2d 1081. To the extent that Sebastian attempts to rely on Reynolds' position as a precinct captain and South Side Irish Parade coordinator, the Court notes that Reynolds assumed these duties in 2005 and 2006 respectively, *after* the 2004 promotions process.

Finally, while Sebastian provides at least some vague details regarding Hammersmith's political activities, the strained inferences are also insufficient to stave off summary judgment. As before, Sebastian has failed to present any actual details to explain how his political affiliation became so well known or who knew of his political affiliation. Furthermore, while Kozicki and Kaderbek were appointed to their positions, the parties present no additional evidence from which one could infer that the two defendants were politically active during the relevant period such that they would otherwise be aware of Hammersmith's, Reynolds', and Hall's political affiliations.

Ultimately fatal to Sebastian's claims against Kaderbek and Kozicki, however, is the absence of any evidence from which one could reasonably infer that either defendant was *aware* of Sebastian's political affiliation or activity. Sebastian contends that all the individual defendants had knowledge of his political affiliation based on his alleged contributions to Alderman Allen's campaigns. The record does not, however, support this assertion. While the parties dispute whether Allen and Sebastian discussed Sebastian's contributions, the parties' Local Rule 56.1 submissions

64

provide no indication that Sebastian ever discussed the nature of his contributions with anyone other than Allen. Nor is there evidence that Allen, if he was aware of Sebastian's contributions, discussed the matter with Kozicki, Kaderbek, or any other City employee. Again, Sebastian's argument is based on speculation rather than the record.

Finally, Sebastian proffers as evidence against Kozicki and Kaderbek that, when Sebastian's counsel attempted to depose Molloy, Falcon, and Ciaravino in conjunction with this action, all three individuals asserted their rights to remain silent. As Sebastian correctly notes, a trier of fact may draw an adverse inference against a party to a civil action who refuses to testify under his Fifth Amendment right. *See LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995). In the present case, however, the Court is not confronted with a party's refusal to testify. Instead, Sebastian attempts to use the refusal of three nonparty witnesses' invocations of the right as admissible evidence against parties in the current action. "In order to impute a third-party's Fifth Amendment invocation to another party, the party seeking to use the invocation must establish some relationship of loyalty between the other two parties." *State Farm Mut. Auto. Ins. Co. v. Abrams,* No. 96 C 63656, 2000 U.S. Dist. LEXIS 6837, at * 21 (N.D. Ill. May 11, 2000) (citing *LiButti v. United States*, 107 F.3d 110, 122 (2d Cir. 1997)). Ultimately, the question of whether a nonparty's refusal to testify may be used against a party is determined on a case-by-case basis and depends on whether such an "'adverse inference is trustworthy under all of the circumstances and will advance the search for truth.'" *Kontos v. Kontos*, 968 F. Supp. 400, 406 (S.D. Ind. 1997) (*quoting LiButti v. United States*, 107 F.3d 110, 124 (2nd Cir. 1997)). Most courts that have imputed an adverse Fifth Amendment inference from a nonparty to a party have done so where there is a close family

relationship between the party and the nonparty or a business relationship, such as an agency or employer-employee relationship. *See State Farm Mut. Auto Ins. Co.*, 2000 U.S. Dist. LEXIS 6837, at \*22 (collecting cases); *Kontos*, 968 F. Supp. at 408.

Citing only to the general rule that an adverse inference may be drawn by a party's invocation of the Fifth Amendment right, Sebastian does not make the necessary arguments or provide the necessary supporting facts to draw an adverse inference with respect to Molloy and Falcon. *See generally State Farm Mutual Auto. Ins. Co.,* 2000 U.S. Dist. LEXIS 6837, at \*17-26; *Kontos*, 968 F.3d at 408-09. Sebastian proffers no evidence that either individual worked for the Department or in a manner that created a business or agency relationship with Kaderbek or Kozicki. Sebastian's application of Ciaravino's invocation of the Fifth Amendment as against Kozicki fails for similar reasons. *See Kontos*, 968 F.3d at 408-09.

The record presents a closer question with respect to Ciaravino and Kaderbek. While the parties dispute whether Ciaravino was the director of personnel or the Director of Administration for the Department, it is undisputed that Ciaravino was a City employee in the Department, that Kaderbek was the Commissioner of the Department, and that Kaderbek retained final decision-making authority for employment decisions made within the Department during the time period at issue. Nevertheless, the Court need not determine whether such facts are sufficient to establish a relationship of loyalty because the resulting adverse inference could not create a question of fact as to Kaderbek's requisite awareness. "Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege." *Kontos*, 968 F.3d at 408-09. Thus, a

66

moving party must introduce actual independent, material evidence that the elements of the party's

case exists; he cannot rely solely on the adverse inference associated with the invocation of the Fifth

Amendment right. *See LaSalle Bank Lake View*, 54 F.3d at 390-91; *State Farm Mutual Auto. Ins.*

*Co.,* 2000 U.S. Dist. LEXIS 6837, at *18-20. As noted above, Sebastian proffers no actual evidence

to support his assertion that Kaderbek was aware of Sebastian's political affiliation or the affiliation

of Hall, Reynolds, and Hammersmith. In fact, the evidence is to the contrary – the interviewers did

not review political affiliation and work prior to the interviews. In the absence of such evidence,

Sebastian cannot rely on speculation as evidence. *See Hedberg*, 47 F.3d at 931-32; *Kontos*, 968 F.3d

at 408-09.

The Court concludes that Sebastian has failed to satisfy the "threshold question" of whether

Kaderbek and Kozicki had the necessary awareness of Sebastian's political affiliation or the political

affiliation of Hall, Reynolds, and Hammersmith. *See Hall*, 389 F.3d at 762. Because Sebastian fails

to present any evidence from which a reasonable jury could infer the requisite awareness, summary

judgment is appropriate on Sebastian's claim of political retaliation against Kozicki and Kaderbek.[34]

*See Cusson-Cobb*, 953 F.2d at 1081; *Downey v. Shonkwiler,* No. 05-3001, 2007 U.S. Dist. LEXIS

73505, at *11 (C.D. Ill. Oct. 2, 2007) ( no awareness when no evidence that political affiliation was

a factor in the decision, let alone a substantial or motivating factor).

B.      *Defendant Allen*

Unlike his claims against Kaderbek and Kozicki, Sebastian has presented sufficient evidence

---

[34] Kozicki and Kaderbek also contend that they are entitled to qualified immunity with respect to Sebastian's § 1983 claim. In light of the Court's determination that a reasonable trier of fact could not conclude that Kozicki or Kaderbek violated Sebastian's First Amendment rights, the Court need not address the issue of qualified immunity.

to survive summary judgment with respect to his § 1983 political retaliation claim against Allen. Specifically, a genuine issue of material fact exists as to whether Allen was aware of Sebastian's political affiliation, whether the political affiliation was a substantial or motivating fact in the decision not to promote him, and whether Sebastian would not have been promoted even if he had not engaged in the constitutionally protected activity.

Allen initially contends that he cannot be liable under § 1983 because he was unaware of Sebastian's constitutionally protected activity. Yet, the record reveals factual disputes regarding: (1) the extent to which Allen encouraged Sebastian to donate to Alderman Allen's campaign; (2) whether Allen told Sebastian that his 2001 contribution was insufficient; (3) whether Allen told Sebastian he was a "cheap Indian"; and (4) whether Allen told Sebastian that he would not be promoted because he was "not politically involved." A reasonable juror could conclude that Allen was aware of Sebastian's political affiliation during the 2004 supervisor interview process.

A reasonable trier of fact could conclude that "not politically involved" statement was "causally related to the [employment] decision making process" and, therefore, probative of retaliation. *See Williams v. Seniff*, 342 F.3d 774, 790 (7th Cir. 2003) (*citing Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996)). To the extent that the retaliatory nature of this statement is ambiguous, the issue is for the jury. *Phelan,* 463 F.3d at 782 (internal quotations omitted).

In addition to this statement, Sebastian also proffers evidence of irregularities during and after Sebastian's interview that create a question of fact as to Allen's true intentions. The parties dispute whether Allen: (1) asked Sebastian all eight Code questions; (2) asked Sebastian different technical questions as compared to all of the other candidates; (3) asked Sebastian different

questions than those included on the Code questions list; (4) met with Kozicki and Bush after all of the interviews to discuss all the candidates; and (5) conveyed false information to Kozicki regarding Sebastian's interview..  The Court is mindful that is does not "sit as a superpersonnel department" and that an employer may employ a subjective analysis when assessing an applicant during the interview process.  *See Blise*, 409 F.3d at 868.  In this case, however, the departure from the standards with respect to Sebastian and the multiple disputes regarding Allen's alleged manipulation of Sebastian's interview creates a genuine issue of material fact for the jury.  *See, e.g., Healy*, 450 F.3d at 744 n.16 ("[A] departure from [a standard list of questions] is suspicious.").  Thus, for the reasons set forth above, Sebastian has also carried his burden on summary judgment with respect to the second element of the *prima facie* case.

Because Sebastian has provided sufficient evidence of a *prima facie* case to survive summary judgment, the burden shifts to Allen to produce evidence that Sebastian would not have received the promotion in the absence of his political affiliation.  *See Healy*, 450 F.3d at 739.  Here, Allen asserts that Sebastian would not have received the promotion because Allen ranked Sebastian eleventh out of eleven candidates and Kozicki ranked Sebastian tenth out of fifteen candidates.  In addition, Allen submits that Kozicki and Allen both believed that Sebastian performed poorly in his interview and did not provide detailed remarks or examples in response to the questions posed.

Assuming Allen has provided sufficient evidence, Sebastian must "show that [Allen's] proffered reasons were pretextual and that discrimination was the real reason for the [employment action]." *Id.* (internal quotations omitted).  Sebastian has put forth sufficient evidence to clear this hurdle at summary judgment.  While objective scores resulting from the interview process may, in

some instances, serve as a legitimate, non-discriminatory reason for an employment decision, *see, e.g., Healy*, 450 F.3d at 741, the pretextual nature of the process (and the results) may be called into question when "the hiring decision was manipulated by one member who possessed" retaliatory motive, *see Hall*, 389 F.3d at 763.  In this case, Sebastian has created a triable issue as to whether and to what extent Allen's alleged retaliatory animus motivated the promotion decision.  *Compare Healy*, 450 F.3d at 741 (plaintiff failed to present sufficient evidence that the interview panel acted as the defendant's "'cat's paw'").  Allen, along with Kozicki, interviewed Hall, Hammersmith, Reynolds, and Sebastian.  In addition, as noted above, the record reveals multiple factual disputes regarding Sebastian's interview, the information conveyed to Kozicki (and, ultimately, Kaderbek) regarding Sebastian's interview, and Ciaravino's drafting of notification letters.  Finally, to the extent that Allen relies on the subsequent explanations regarding Sebastian's performance to substantiate his proffered reason, any decision regarding the merits of the claim and the weight of such evidence is best left to the finder of fact.  *See McGreal v. Ostrov*, 368 F.3d 657, 677 (7th Cir. 2004)  ("It is rarely appropriate on summary judgment for a district court to make a finding on a state of mind.").  Thus, for the reasons stated above, Allen's Motion for Summary Judgment is denied with respect to Count III.

C.     *Municipal Liability*

The doctrine of respondeat superior cannot be utilized to hold local governmental units liable for § 1983 violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  A municipality may only be held liable under § 1983 when its policy or custom results in a constitutional injury to the plaintiff.  *See id.* at 694. To establish a policy or custom, a plaintiff must allege either: (1) "'an

express policy that, when enforced, causes a constitutional deprivation'"; (2) the act of a person with final policymaking authority caused the constitutional injury; or (3) "'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (*quoting Baxter by Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994)). In the present case, Sebastian does not argue that the City had an express policy of retaliating against persons on account of their political affiliation; nor does he claim that the alleged constitutional deprivation was committed by an individual with final policymaking authority. Instead, Sebastian maintains that the City is liable because: (1) the City has a widespread practice that constitutes a "custom and usage" with the force of law and (2) the individual defendants had sufficient input into the selection process such that the selection process was "poisoned" by discriminatory motivation. Because Sebastian has not created a triable issue under either theory, the Court grants summary judgment in favor of the City with respect to Count III.

i.      *Widespread Practice*

To support widespread practice, Sebastian proffers: (1) the testimony from the *Sorich* trial; (2) Kozicki's admission that he previously changed his interview ratings during a 2004 building inspector hiring sequence; and (3) Molloy's, Falcon's, and Ciaravino's invocation of their respective Fifth Amendment rights. At the criminal trial, Molloy, who worked as Sorich's secretary at the IGA, testified extensively about the "Clout List" and the index card files compiled during her tenure. Similarly, Falcon, who served as the personnel director for the Department of Sewers from 1994 through 2003 and the Department of Water Management from 2003 through 2005, testified about

the corruption within the City's hiring process for the Department of Sewers and Department of Water Management. Finally, Katalinic, who served as the Deputy Commissioner of Street Operations for the Streets & Sanitation Department also testified regarding his requests for city jobs and promotions for his political workers. Noticeably absent from this evidence is any testimony from the three individuals regarding the hiring process employed in the Department of Buildings in 2004. Molloy's, Falcon's, and Katalinic's testimony is largely irrelevant to this case, as the events described occurred in departments that are not at issue in this case, for different positions, and with different decision makers. *Cf. Collello v. City of Chicago*, No. 06 C 6243 (N.D. Ill. Jan. 4, 2008) (Holderman, J.). Absent such evidence, the Court is unwilling to paint municipal liability with such a broad brush.

Nor does Kozicki's admission that he previously changed his interview ratings scores for candidate Ryan establish this link. Sebastian submits that Kozicki admitted to manipulating the selection process for other Department hiring sequences to ensure that politically favored candidates received the positions. In doing so, Sebastian overstates the evidence provided in his Local Rule 56.1 submissions. Kozicki changed his interview scores for one individual during a hiring process for a building inspector position because the individual was the son of an important union official and Kaderbek allegedly believed that hiring the individual as well as one other candidate would help with union negotiations and other Department goals. The evidence proffered provides no indication that Kozicki manipulated the scores on account of political affiliation, but rather, union affiliation. Nor is there any indication that the union affiliation at issue in the 2004 building inspector hiring sequence was related to a political purpose. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th

Cir. 1996) (the idea that membership in a union is a political affiliation is "a dubious notion at best"). Further, the Court notes that, even if a trier of fact unreasonably assumed that Kozicki changed the ratings on account of political affiliation, "proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion County*, 327 F.3d 588, 595-96 (7th Cir. 2003).

Finally, Sebastian relies on Molloy's, Falcon's, and Ciaravino's invocation of their Fifth Amendment right. While Sebastian may impute the adverse inference associated with their Fifth Amendment invocations to the City because of the agency relationship between the three individuals and the City, *see State Farm Mut. Auto. Ins. Co.*, 2000 U.S. Dist. LEXIS 6837, at *22, such adverse inferences do not stave off dismissal of the municipal liability claim for two reasons. First, with respect to Molloy and Falcon, Sebastian has failed to present evidence, through their testimony at the *Sorich* trial or otherwise, that either individual had personal involvement in or knowledge regarding corrupt hiring processes within the Department of Buildings during the relevant time period. *See Hall*, 389 F.3d at 764. Second, with respect to all three nonparty witnesses, Sebastian has failed to present independent corroborative evidence that the elements of the claim exist. *See State Farm Mut. Auto. Ins. Co.,* 2000 U.S. Dist. LEXIS 6837, at *18-20. As noted above, a party cannot rely solely on the adverse inference associated with invocation of the Fifth Amendment right to establish a claim. *See LaSalle Bank Lake View*, 54 F.3d at 390-91.

Thus, because Sebastian has failed to proffer competent evidence from which a reasonable trier of fact could infer that City final policymakers knew of a widespread practice and acquiesced in a pattern of unconstitutional conduct such that the City was deliberately indifferent to an obvious

or known consequence of the practice, the Court grants the City's motion for summary judgment with respect to Sebastian's widespread practice claim of municipal liability.

ii.      *Tainted Selection Process*

Sebastian does not dispute the City's contention that Kaderbek did not have final policymaking authority, nor does he argue that the ultimate decision maker delegated final policymaking authority to Kaderbek or ratified the unconstitutional conduct of a subordinate.[35] Instead, Sebastian argues that the City may be liable because the individual defendants "poisoned" the selection process with discriminatory motivation through its critical "input" in the decision making process. In doing so, Sebastian relies primarily on *Waters v. City of Chicago*, 416 F. Supp. 2d 628 (N.D. Ill. 2006). In *Waters,* the court analogized and applied the well-established "cat's paw" theory of Title VII liability to a § 1983 municipal liability claim against the City of Chicago. *See Waters*, 416 F. Supp. 2d at 630-31. Specifically, the *Waters* court noted "that if the ultimate decision is poisoned by discriminatory or retaliatory motivation on the part of another person whose input is critical to the ultimate decision, it does not matter that the ultimate decisionmaker is as pure as driven snow-Section 1983 liability can be imposed." *Id.* at 631-32.

The Court respectfully declines to adopt the *Waters* approach. While the Court has recognized and applied this theory in the context of Title VII liability, Sebastian has not cited, nor is the Court aware of, any binding legal authority that supports the application of this theory in the

_____

[35] While Sebastian cites to *Waters v. City of Chicago*, 416 F. Supp. 2d 628 (N.D. Ill. 2006), which discusses ratification and delegation, Sebastian's argument centers upon the theory of a selection process "poisoned" by the "input" of the individual defendants. Thus, the Court will not consider whether the ultimate decision maker delegated final policymaking authority to Kaderbek or ratified the unconstitutional conduct of a subordinate. *See Culver*, 416 F.3d at 550; *see also Graham*, 2007 U.S. App. LEXIS 21598, at *12.

context of § 1983 municipal liability claims. To the contrary, the Seventh Circuit has emphasized that "[n]either respondeat superior nor negligent supervision of subordinates is an authorized ground of liability in a suit under 42 U.S.C. § 1983," *see Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993), and that a plaintiff cannot establish municipal liability under § 1983 "by simply alleging that the municipality failed to investigate an incident," *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998). *See also Monell,* 436 U.S. at 691.

In light of the foregoing, the Court grants the City's motion for summary judgment with respect to Count III.

## IV.  Indemnification (Count IV)

Finally, the City[36] moves for summary judgment on Sebastian's claim for indemnification. In Count IV, Sebastian asserts a demand of judgment pursuant to 745 ILCS 10/9-102 against the City for any amount awarded to Sebastian for the acts of Allen, Kozicki, and Kaderbek. (Pl. Sec. Am. Compl., Count IV ¶¶ 1-37.)  Section 10/9-102 of the Illinois Tort Immunity Act directs a local public entity "to pay any tort judgment . . . for compensatory damages . . . for which it or an employee while acting within the scope of his employment is liable." 745 ILCS 10/9-102.  Under Section 10/2-109, however, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109.  Having concluded that neither Kaderbek nor Kozicki retaliated against Sebastian in violation of § 1983, the Court grants summary judgement in favor of the City on Sebastian's claim for indemnification with

---

[36] In his reply memorandum, Allen submits that he is also entitled to summary judgment with respect to Count IV. The allegations within Count IV of Sebastian's Second Amended Complaint are directed solely at the City, not the individual defendants. Thus, Allen need not move for summary judgment with respect to Count IV as the Second Amended Complaint does not contain such a claim against him in his individual capacity.

respect to Kaderbek and Kozicki. *See* 745 ILCS 10/2-109.

Still at issue, however, is whether the City may be held liable for the actions taken by Allen with respect to Sebastian's § 1983 claim. The City may be held liable for actions taken by its employee while acting within the scope of his employment. *See* 745 ILCS 10/9-102. Sebastian must establish that Allen was acting within the scope of his employment when he engaged in the activities underlying Sebastian's political retaliation claim. *See Pyne v. Witmer*, 543 N.E.2d 1304, 1309 (Ill. 1989). To be within the scope of employment, an employee's acts must be: (a) the kind he is employed to perform; (b) substantially within the authorized time and space limits; and (c) actuated, at least in part, by a purpose to serve the master. *Id.*

The City maintains that Allen was not acting within the scope of his employment because the City prohibits the use of political factors in employment decisions affecting career service employees. Sebastian submits, however, that the conduct was within the relevant scope because it was part of the culture of the City. Neither argument, both of which are noticeably deficient with respect to analysis and legal authority, is persuasive. An intentional tort is considered to be within the scope of employment when it is committed, at least in part, to serve or further the employer's business, despite its illegality or violation of employer policy. *See Prothro v. Nat'l Bankcard Corp.*, No. 04 C 7857, 2006 U.S. Dist. LEXIS 57553, at *19 (N.D. Ill. Aug. 3, 2006) (*citing* Restatement (Second) of Agency § 219(1)); *see also Taboas v. Mlynczak*, 149 F.3d 576, 582-83 (7th Cir. 1998) (an employment decision motivated by ill will or bad faith may still be within the scope of employment). Summary judgment "is generally inappropriate when scope of employment is at issue. Only if no reasonable person could conclude from the evidence that an employee was acting

within the course of employment should a court hold as a matter of law that the employee was not so acting." *Pyne*, 543 N.E.2d at 1309 (internal citations omitted).

In the present case, there remains a question of fact as to whether Allen was acting within the scope of his employment with respect to Sebastian's § 1983 claim. According to Sebastian's version of the events at issue, Allen was Sebastian's superior in the EB Department. Sebastian approached Allen while the two individuals were at work and proceeded to discuss the supervisor position when Allen allegedly commented on Sebastian's lack of political activity. Kozicki subsequently asked Allen to participate in the interview process in his capacity as a City employee, which he did in a number of ways, including creating the Code questions, directly interviewing the candidates, discussing the candidates' interviews, and scoring the candidates. Such facts present a genuine issue of material fact as to whether Allen was acting within his scope of employment and, more specifically, whether he was motivated, at least in part, to serve the City's interests. Accordingly, summary judgment is denied with respect to Count IV. *See id.* at 1309-11.

### CONCLUSION AND ORDER

For the reasons stated herein, Defendant Allen's Motion For Summary Judgment is denied with respect to Count III and granted with respect to Counts I and II. Defendants City of Chicago, Kaderbek and Kozicki's Motion For Summary Judgment is granted in part and denied in part. Specifically, summary judgment is denied as to Counts I and IV, but granted with respect to Counts II and III. Finally, Sebastian's Motion to Strike portions of Defendants' reply pleadings is granted in part and denied in part consistent with this Opinion.

So ordered.

Hon. Virginia M. Kendall
United States District Court
Northern District of Illinois

Date:  July 24, 2008